Seldeh, J.
 

 This is a contest between two sets of individuals, each claiming to be- trustees of the parish of Bellport; and the action is brought to recover possession of the church edifice, and the lot upon which it stands; from which the plaintiffs, as they allege, have been excluded by the defendants. The first position taken by the defendants is, that their title to the property cannot be tried in this action, but that the plaintiffs must resort to the mode prescribed by statute for testing their rights.
 

 The present statutory provision on the subject is contained in the Code. Section 432 provides that an action may be brought
 
 *270
 
 by thfe Attorney-General, in the name of the People of the State, upon his own information, or upon the complaint of any private party, against any person who shall usurp or intrude into any public office, or “ any office in any
 
 corporation
 
 created by the authority of this State.” This no doubt is in ordinary cases the most appropriate and convenient way of trying the title of any one, to a corporate office; and in cases where no right of property is invaded, it is frequently the only way. But the legal title of the church and lot in question here, is absolutely vested in the trustees of the corporation; and I am inclined to the opinion that if those who are justly entitled, to that office have been wrongfully excluded from the possession and control of the property, they may maintain an action in their own names to recover that possession. I have, however, given to this question but a slight examination for the reason that, in the view I take of the case, it is not important to settle it. Neither have I examined very critically to see whether the case shows an actual exclusion of the plaintiffs by the defendants ; but have assumed, as the counsel on both sides seem to have assumed, that an ouster of the plaintiffs in their character as trustees, though not as individual corporators, is established. The question then is, upon the right of the plaintiffs to be considered as the trustees of the corporate body. The corporation itself was unnecessarily and improperly made a party, and will be disregarded.
 

 The whole theory of the plaintiffs’ case rests obviously upon the assumption that as the religious society in Bellport was, from its commencement in 1836 to its incorporation in 1849, Congregational in its character, this feature of Congregationalism entered as .an element into the act of incorporation,' so that the society became incorporated, not merely as a religious, but as a Congregational society.
 

 This assumption is clearly unfounded. Corporations formed under the 3d section of the act of 1813,- have no denominational- character, nor can such a character be in any manner engrafted upon them. . That portion of the members organized into a separate body called the church, may belong to a peculiar
 
 *271
 
 denomination, but it has no power to impress its distinctive character upon the corporation, so as to render it ineffaceable by the voice of a majority of the corporators. These two bodies, viz.: the corporation and the church, although one may exist within the pale of the other, are in no respect correlative. The objects and interests of the one are moral and spiritual; the other deals exclusively with things temporal and material.
 

 The existence of the church proper, as an organized body, is not recognized by the municipal law; nor does its existence or non-existence, or its denominational character or connections, in any manner affect the legal nature of the corporation. Each as a body is entirely independent, and free from any direct control or interference by the other; and yet it is easy' to see that the majority of the corporators, if so disposed, may, through their control over the property and revenues of the society, exercise an important incidental influence upon the character and destinies of the church. The present case illustrates the manner in which this influence is exerted. The plaintiffs’ counsel is clearly mistaken in supposing that the meeting of the 28th of November, 1851, wrought the change of which he complains. Even if that had been a meeting of the members of the
 
 parish
 
 of Bellport, instead of being, as it was, a meeting of the'
 
 inhabitants
 
 of .the village of Bell-port, its proceedings could
 
 per se
 
 have had no effect upon the sectarian character of the society. That depended upon the rules and ordinances of the church, with which the corporation, as such, had nothing whatever to do. Neither the proceedings of that meeting, nor the subsequent action of the Presbytery in organizing a Presbyterian Church, were in themselves of any legal consequence. They were only important as indicative of the views and sentiments of a majority of the members of the society, and of the manner in which they would be disposed to exercise their legitimate corporate powers.
 

 The change in the character of the congregation, of which the plaintiffs complain, has been brought about, not by the pro ceedings of the Presbytery, or the resolutions of the society
 
 *272
 
 but by the action of the trustees in employing a Presbyterian clergyman, and opening the meeting-house to Ms ministrations. This they had a legal right to do. The trustees are the representatives of the corporate body, and the statute invests them with extensive powers. They are entitled to the possession and management of all the property of the corporation, and are empowered to exercise its entire administrative functions. The legislature has been careful to guard against the abuse of this authority, by providing, in section 8, that the salary of the minister shall be regulated, not by the trustees, but by a majority of the corporators, at a meeting called for that purpose. Subject to this important and most efficient check, the trustees have the undoubted power of determining by whom the pulpit shall be occupied. It is quite apparent that this power, which the statute plainly confers, must of necessity give to the trustees and a majority of the corporators, when united, virtual control over the forms and ordinances to be observed. The act for the incorporation of religious societies was obviously framed with a view to, and in accordance with, that just and sound principle which lies at the basis of all our civic institutions, viz.: that in every organized society, the controlling power should be in the hands of the majority.
 

 TMs may, in some instances, as perhaps it does in the present instance, operate with severity and apparent injustice by enabling those who have recently become members of the society, if in a majority and so disposed, to change its religious character and modes of worship, against the will of its original founders and chief contributors. But the evil arising from these rare cases is more than counterbalanced by the effect of this legislation in putting an end to religious controversy, and removing from the civil tribunals a species of litigation with which they are in general qrnte unqualified to deal.
 

 But while our laws have thus secured to every incorporated religious society the power, as a general rule, to modify, from time to time, its ordinances and forms, so as to harmonize with the views and wishes of the majority of its members, they also afford to those who may desire it ample means of guard
 
 *273
 
 ing against any radical change. If a body of persons of homogeneous views, upon becoming incorporated, are desirous of maintaining unchangeable forms, a uniform faith, and permanent religious connections, there are two modes in which this object can be accomplished. One is, by causing their church edifice and lot to be conveyed to the society, upon the express condition that it should be forever thereafter devoted to the purposes of religious worship by a congregation maintaining a certain faith, and observing certain prescribed ordinances and forms. Such a condition inserted in a deed to the society, if definitely and clearly expressed, would be valid, and would no doubt operate as an effectual guaranty against any change in the religious character of the society.
 

 But the provisions of the act itself, under which such societies are incorpdrated, suggest another mode by which permanence and steady and unchangeable forms may be secured. Section 7 provides that no person shall become a member of such society after its incorporation, and entitled to vote at any election, unless he has been “a stated attendant” on the worship of the society for at least one year before such election. Mow the society has obviously, through its trustees, Ml power to determine what persons it will thus admit to membership. It is under no obligation, more than any other organized association, to receive obnoxious persons, or those likely to create either disturbance or division. The trustees own and control the church edifice, and are expressly authorized, by section 4, “ to regulate ” the renting of the pews, and may of course adopt such rules on the subject as they may deem expedient. The act evidently contemplates that the society will, or at least may, discriminate among those desirous of uniting with it. The latter portion of section 7 provides that “ the clerk to the trustees shall keep a register of the names of all such persons
 
 as shall desire
 
 to become stated hearers in the said church, congregation or society, and shall therein note the time when such request was made; and the said clerk shall attend all such subsequent elections in order
 
 to test the qualifications
 
 of such electors, in case the same should be questioned.”
 

 
 *274
 
 This provision looks to a formal application, in each instance, to. the corporate authorities for admission into the society; and the trustees may no doubt adopt such regulations that no pew can be rented originally, or sold or assigned to a new occupant, with-, out their previous consent, or even that of the society itself.
 

 Tf, however, a society, instead of adopting these appropriate- and effectual precautions, chooses to throw open its doors to the public at large, and invite in new members, irrespective of their personal character or religious tendencies, they have no reason to complain that the powers and privileges of their new associates, whom they have voluntarilyreceived, and of whose contributions they avail themselves, should be the same as their own.
 

 It follows from these principles, that the change in the reli-. gious character of the parish of Bellport has been produced by the exercise by the trustees, and the majority of the corpora-tors, of their legitimate powers. The idea upon which the plaintiffs rest the regularity of their election as trustees, viz.: that the defendants and those who elected them, were to be regarded as seceders from the society, has no legal foundation. Seceders from Congregationalism, in a religious sense, they may have been; but this could not disfranchise them as corporators. The corporators are those who can vote at the elections; and their qualifications are, as we have seen, prescribed by the stat. ute. If they have been stated attendants upon the worship of the society for one year next before the election, they are entitled to vote. Hothing else is required; and it is plain that there is no power which can add to these qualifications, or which can properly say to one who possesses them that unless he also adheres to the peculiar faith and governmental forms of the society he cannot vote. Every election at which per-. sons are prohibited from voting upon any such ground is of course illegal. Secession from the doctrines or faith of the church is a purely religious offence, and the ecclesiastical judicatories alone can take cognizance of it.
 

 As between the two elections, therefore, of the 21st and 24th of February, 1852, to which the plaintiffs and defendants
 
 *275
 
 respectively trace their title as trustees, there is no doubt which is to be considered as legitimate and regular. It would be difficult, under th<^ proof, to discriminate between these two elections, in respect to the regularity of the meetings at which they took place. Bach purports to have been called pursuant to the statute; and hence if their proceedings had been properly conducted, there would have been nothing but the order of time to give precedence to either. But the case shows that at the,, election on the twenty-fourth, all those members of the corporation who adhered to the Presbyterian organization were prohibited from voting, on the ground that they were seceders from the sociéty. This is entirely fatal to that election, and no rights dependent upon it can have any validity. Ho such objection attaches to the election of the twenty-first, and there is nothing whatever to impeach its regularity. The defendants therefore, who deduce their title by regular succession from this election, must be regarded as the legitimate and rightful trustees of the corporation.
 

 The judgment of the Supreme Court must be affirmed.
 

 H
 

 All the judges concurring,
 

 Judgment affirmed.