Livingston v. Rector, &c., of Trinity Church.

STATE, ALFRED M. LIVINGSTON, PROSECUTOR, v. RECTOR, WARDENS AND VESTRYMEN OF TRINITY CHURCH, IN TRENTON.

1. The English ecclesiastical law is the basis of the law regulating the affairs of the Episcopal church in this country, and is in force except so far as it has been modified and changed by statute or by the canons and usages of the church.

2. By force of the act for the incorporation of religious societies, and the supplements thereto, the wardens and vestrymen of the church are the trustees of the church, and to the rector, wardens and vestrymen is committed the entire control over the temporalities of the church, including the discretionary authority which, by the English ecclesiastical law, was exercised by the Ordinary and by the church wardens in the disposition of the seats and pews in the church, and the by-laws and regulations adopted by the vestry on that subject become rules for the government of the church in that respect.

3. The discretionary power of the Ordinary, and the church wardens as his representatives, in the assignment of pews in the church is a fundamental law of the English church, and considered indispensable for the maintenance of order and discipline in the church, and the renunciation of such an authority by the officers of the church will not be inferred from any plan adopted for the government of a particular church, unless the renunciation be expressed in words of unequivocal import.

4. Courts of law will interpose to control the proceedings of ecclesiastical bodies where a right of property is involved, but with respect to the spiritual and temporal affairs of the church, not affecting the civil rights of individuals or the property of the corporation, the ecclesiastical courts and governing bodies of the religious society have exclusive jurisdiction, and their decisions are final.

5. The rule of law that a special tribunal having judicial, or *quasi* judicial, functions annexed to its powers, whose power to act in a particular case depends upon its determination of certain facts, must allow a hearing to persons whose property or personal rights may be affected by its decision, does not prevail where the act done is purely discretionary. In such cases, a court of law will not review the acts or resolutions of such a body by its writ of *certiorari*, although no reasons be assigned for the act done, or an objectionable reason be assigned. In the latter case, a party injured will be left to his redress by action.

6. By the canons of the church of the Diocese of New Jersey, the right to vote at parish meetings is given to all male attendants of the church who are either communicants not under repulsion, or are the

Livingston v. Rector, &c., of Trinity Church.

holders of seats in the parish church, or where the seats are not rented, who have contributed to the support of the church in the way appointed in that parish. The prosecutor, being a communicant and not under repulsion, will, as such, be entitled to vote at parish meetings, and is not injured in that respect by a resolution of the vestry declining to receive any further contributions from him for parish or other purposes.

On *certiorari.*

Argued at November Term, 1882, before Justices DEPUE, VAN SYCKEL and REED.

For the plaintiff in *certiorari, G. D. W. Vroom* and *H. C. Pitney.*

*Contra, F. C. Lowthorp, Jr.,* and *J. H. Stewart.*

The opinion of the court was delivered by

DEPUE, J. The object of this writ is to obtain the vacation, by a judicial judgment of this court, of the following preamble and resolution, adopted on the 13th of April, 1882, by the trustees and vestrymen of Trinity Church, in Trenton :

"WHEREAS, It is known to this vestry that Alfred M. Livingston, a member of Trinity parish, has, for a long time in the past, been and still is adverse and detrimental to the prosperity of the parish ; AND WHEREAS, he has very recently been guilty of using false, malicious and slanderous language to and of the rector; therefore, be it resolved, and it is by the unanimous vote of the wardens and vestrymen of Trinity Episcopal Church, Trenton, N. J.,

"*Resolved,* That the name of Alfred M. Livingston be removed from the diagram of this church, and that the said Alfred M. Livingston be notified that the vestry has removed his name from the diagram of sittings in the church, and has assigned the pew heretofore occupied by him to other persons, and decline to receive any further contributions from him for

parish or other purposes; that this resolution of the vestry be entered at large in the minutes, and a duly attested copy be sent him by the secretary."

The pew occupied by the prosecutor is pew No. 13.

In the decision of the legal questions presented by this writ, we must exclude consideration of the matters contained in the preamble which precedes the resolution. A writ of *certiorari* will not, lie to revise or correct erroneous opinions, however hurtful they may be to individuals against whom they are expressed. The court, under such a writ, can only review some order, judgment or determination affecting the rights of the prosecutor. *State* v. *Medical Society,* 9 *Vroom* 377. If the words uttered or written be defamatory, in a legal sense, and actionable, redress in the civil courts must be sought in another form of proceeding.

The injury whereon the prosecutor founds his right to the use of this writ is, that he was by the resolution unlawfully deprived of a right to the pew he had previously occupied in the church.

In England, before the Reformation, the body of the church was common to all parishioners. After the Reformation, a practice arose to assign particular seats to individuals. This assignment of seats was made by the Ordinary, by a faculty which was a mere license, and was personal to the licensee; and all disputes concerning it were determined in the spiritual courts. 1 *Zab.* 329, *note to Pres. Ch.* v. *Andrus;* 1 *Burn's Ecc. L.* 358, *"Church" VII.; Bouv. Law Dic., tit. "Faculty."* Every parishioner has a right to a seat in the parish church but not to a pew. *In re Cathredral Church,* 8 *L. T.* (*N. S.*) 861.

The disposal of seats in the nave of the church appertaineth of common right to the bishop of the diocese, "so that he may place and displace whomsoever he pleaseth," (1 *Burn's Ecc. L.* 359; *Com. Dig., tit. "Eglise," G* 3 ; *Boothby* v. *Baily, Hob.* 69,) and the ordering thereof is a matter merely spirit-

ual. *Corven's case*, 12 *Co.* 105; *Hook's Church Dic.*, *tit.* "*Pews.*"

The discretionary power of ordering the seats in the church which, by the common law, was vested in the Ordinary, by custom was exercised by the church wardens, who were the representatives of the Ordinary in that respect, and whose assignment of seats was presumed to have been made with the approbation and consent of the Ordinary. 1 *Burn's Ecc. L.* 359; 2 *Bac. Abr.* 242, "*Church Warden*" *II.*; *Wood's Inst.* 88, 90. Consequently, it has become the settled law of the English courts that church wardens have a discretionary power to appropriate the pews in the church, subject only to the control of the Ordinary. *Reynolds* v. *Monkton*, 2 *M. & R.* 384; *In re Cathedral Church*, 8 *L. T.* (*N. S.*) 861.

Courts of law will interpose to control the proceedings of ecclesiastical bodies when a right to property is involved, but in no other instances. A court of law will inquire into the regularity of the election of trustees of a religious corporation, to whom the property of the corporation is committed, and will determine the qualifications of the voters who are allowed to vote at such an election. *State* v. *Crowell*, 4 *Halst.* 390. It will also, when the right to property is in issue, institute an inquiry into the doctrines and opinions of a religious society, as facts upon which the ownership of property may depend. *Hendrickson* v. *Decow*, *Saxt.* 577. But with respect to spiritual matters and the administration of the spiritual and temporal affairs of the church not affecting the civil rights of individuals or the property of the corporation, the ecclesiastical courts and governing bodies of the religious society have exclusive jurisdiction, and their decisions are final. *Den* v. *Bolton*, 7 *Halst.* 206; *Den* v. *Pilling*, 4 *Zab.* 653; *Van Houten* v. *First Reformed Church*, 2 *C E. Green* 126, 132. A court of law will not interfere with the rules of a voluntary religious society adopted for the regulation of its own affairs, unless to protect some civil right which is infringed by their operation. *Forbes* v. *Eden*, *L. R.*, 1 *Sc. & Div. App.* 568. See, also, *Chase* v. *Cheeney*, 10 *Am. L. Reg.* (*N. S.*) 295, *and*

notes; *Petty* v. *Tooker*, 21 *N. Y.* 267; *People* v. *Germ. U. Ev. Church*, 53 *N. Y.* 103.

An individual right to the occupation of a particular pew will not arise from an occupation of it for ever so long a time. *Boothby* v. *Baily*, Hob. 69; *Wood's Inst.* 90; *Stocks* v. *Booth*, 1 *T. R.* 428. The right can be acquired only by a faculty, which is personal to the grantee, and cannot of itself be given a transmissible or heritable quality, *Stocks* v. *Booth*, 1 *T. R.* 428; *Cliffor* v. *Wicks*, 1 *B. & Ald.* 498; or by prescription, which will not arise from a possession, however long, unless it be annexed to a house, and it also be shown that the pew was repaired by the claimant and those under whom he claims for the prescriptive period, *Hook's Church Dic.*, tit. " *Pews* ; " *Wood's Inst.* 90; or by a grant which, creating an incorporeal interest in lands, must be in writing and under seal; or by a letting for a limited period by the proper authorities of the church. And it is only a legal right of possession acquired by some one of these methods that can be made the foundation of legal proceedings for its protection in a court of law; otherwise, the disturbance of the possession is a matter of ecclesiastical cognizance only. 1 *Chit. Gen. Prac.* 209; *Com. Dig.*, tit. " *Eglise*," *G* 3.; 3 *Inst.* 202; *Stocks* v. *Booth, supra; Manwaring* v. *Giles*, 5 *B. & Ald.* 356; 1 *Chit. Burn's Just.* 629, 633, " *Church*" *IV.; Hook's Church Dic.*, tit. " *Pews.*"

The English ecclesiastical law forms the basis of the law regulating the affairs of the Episcopal church in this country, and is in force except so far as it has been modified and changed by statute and by the usages and canons of the church. *Lynch* v. *Menzies*, 4 *Vroom* 162; *Hoffman's Law of the Church* 14, 30, 34, 64.

In an act passed February 29th, 1828, as a supplement to the act for the incorporation of religious societies of June 12th, 1797, (*Pat.* 412,) it was recited in the preamble that, according to the constitution, usages and customs of the Protestant Episcopal Church, the wardens and vestry of each church, for the time being, have the management of the temporalities of the said church, and that great inconvenience had

been experienced by the temporalities being thereby [by the act of 1797] in trustees other than those who, by the constitution, usages and customs of the said church, should be invested with the said temporalities; and by the first section it was enacted that the wardens and vestry, for the time being, of every Protestant Episcopal Church not specially incorporated, should be trustees of the same, and a body corporate and politic in law by such name as they should assume. *Harr. Com.* 183.

On the 17th of February, 1829, another act was passed which, in the third section, made the rector, wardens and vestrymen a body corporate and politic. *Harr. Com.* 220. By section 4 of the act of 1829, it was enacted that the rector, wardens and vestrymen and their successors, or a majority of them, may make such rules, by-laws and ordinances, and do everything needful and requisite for the good government and support of the church not inconsistent with the constitution and laws of this state or of the United States. The three sections referred to were re-enacted in the revision of 1875 as sections. 27, 31 and 32. *Rev., p.* 962. By force of this legislation, the wardens and vestrymen become trustees of the church, and to the rector, wardens and vestrymen is committed the entire control over the temporalities of the church, including the discretionary authority which, by the English ecclesiastical law, was exercised by the Ordinary, and by the church wardens as his representatives, in the disposition of the seats and pews in the church.

Trinity Church, in Trenton, was, by a certificate filed May 11th, 1859, incorporated under the corporate name of "The Rector, Wardens and Vestrymen of Trinity Church, in Trenton."

In April, 1870, what is called the "Free Church Plan" was proposed. It was approved at a parish meeting held on the 18th of April, 1870, and was adopted by the vestry April 21st, 1870. The principal feature in this plan is expressed as follows:

"That pews shall be appropriated to all regular attendants

upon the services of the church for the Sunday morning service, leaving them, as at present, free and open on all other occasions of public worship. The pews to be appropriated without reference to what is given for the support of the church, but no right of proprietorship to be conferred; the pews to be appropriated by the wardens to the pew-holders, as at present occupied, except where changes are desired, and then in such manner as not to interfere with the present occupant or occupants without his, her or their consent."

On the 4th of April, 1876, the following by-law was adopted by the vestry:

"The wardens shall have power to assign pews or sittings, in conformity with the free church plan as adopted by the congregation of this parish on Easter Monday, April 18th, A. D. 1870, and shall keep a register of the pews or sittings assigned; they shall cause a proper diagram of the pews, with the name of the occupant to whom any pew or portion thereof has been assigned, to be at all times exhibited in the vestibule of the church." *Art. VI.*, § 1.

On the 2d of October, 1877, the vestry adopted the following resolution:

"*Resolved*, That hereafter all arrangements and communications as to the occupation of church pews or sittings, shall be made by and between the wardens and the applicants or occupants of such pews, except where the wardens directly request the aid of the vestrymen or other persons and authorize them to act."

The adoption by the vestry of the free church plan, in April, 1870, the by-law of January, 1876, and the resolution of October, 1877, were acts within the power of the vestry, under the authority conferred by section 4 of the act of 1829, and they became rules for the government of the church in that respect. How far these official acts of the vestry affected its power to dispose of the pew in question by the resolution of April 13th, 1882, was the principal subject of the discussion by counsel.

Alfred S. Livingston, the father of the prosecutor, died in

February, 1875. He was one of the corporators in the organization of the church, and had contributed liberally for its support. He was a communicant, and for many years a vestryman, and he joined in the proposal and adoption of the free church plan. He occupied, with his family, pews 11 and 13 until his death. The method by which pews were originally assigned was by an auction sale, in which the choice of pews was given to the highest bidder. Mr. Livingston, the father, gave $25 each for the privilege of a choice, and selected these two pews and paid the annual rent for them. After his death pew No. 11 was given up, and the prosecutor and the widow of the deceased continued to occupy the pew in question. It is manifest that the prosecutor's father had no alienable or transmissible interest in the pew; for the right to a pew, which will be transmitted to an heir, is an interest in land, within the statute of frauds, and is also subject to that inflexible rule of the common law that an interest in lands lying in grant can only be created by a deed under seal. *First Church* v. *Bigelow*, 16 *Wend.* 28; *Bryant* v. *Whistler*, 8 *B. & C.* 288; *Price* v. *Lyon*, 14 *Conn.* 279. He never had at most more than a leasehold interest in the pew for the term for which pews were usually rented at the annual letting.

If there be any efficacy whatever in the contention of the prosecutor, it must be derived from the plan of 1870. In that plan it is directed that the pews be appropriated by the wardens to the pew-holders " as at present occupied," except where changes are desired, and that when changes are made they shall be made " in such a manner as not to interfere with the present occupant or occupants, without his or their consent." The whole case rests upon the legal effect of these words in the plan of 1870. Keeping in mind that by the English ecclesiastical law the power of the Ordinary and of the church wardens, in the assignment of pews in a church, was discretionary—absolutely and unqualifiedly—and that possession gave the occupant of a pew no legal right which he could interpose against the discretion of the officers of the church, we think it is clear that the language quoted will give

no support to the contention of the prosecutor. The discretionary power of the Ordinary and his representatives in this matter was a fundamental law of the English church, considered to be indispensable for the preservation of order and the maintenance of discipline in the church. A renunciation of such an essential authority in the officers of the church will not be inferred from any scheme adopted for the government of a particular church, unless the renunciation be expressed in words of unequivocal import. The language of the plan of 1870 will not bear that construction. In terms it applied only to the present occupants of pews as the pews were occupied when the plan was adopted. It was not designed to create a pre-emption in favor of occupants of pews in the future *in perpetuo,* and thus in effect deprive the officers of the church, in a considerable degree, of their discretionary powers over the pews in the church. At the utmost, this part of the plan of 1870 was merely a license analogous to a faculty granted by the Ordinary at common law, and if not revocable, was personal to the licensee.

We think the vestry had the power, under the ecclesiastical law and the usages and regulations of the church, to take the action which is expressed in the resolution under review, and there the jurisdiction of this court ends.

But it is contended that the vestry should have given the prosecutor a hearing before they adopted this resolution, and that in this respect that body violated the fundamental rule of law that an opportunity to be heard must be afforded before any decision is made affecting a party's rights. The principle is undoubtedly established that a special tribunal having judicial, or *quasi* judicial, functions annexed to its powers, whose power to act in a particular case depends upon its determination, one way or the other, of certain facts, must allow a hearing to persons whose property or personal rights may be affected by its decision. But this principle does not prevail where the act done is purely discretionary. Consequently, it is the settled law that a writ of *certiorari* will not

lie in a matter wholly discretionary. *Stew. Dig.* 118, " *Certiorari,*" I.

Waiving the question whether this court can, by its writ of *certiorari*, review the regularity of the proceedings of an ecclesiastical body in a matter relating to the spiritual or temporal affairs of a church, (*Chase* v. *Cheeny, supra; People* v. *G. U. E. Church,* 53 *N. Y.* 105; *Bouldin* v. *Alexander,* 15 *Wall.* 131,) it is clear that the prosecutor cannot invoke the principle above mentioned in this case. As we have seen, the control of church officials over the pews of a church is entirely discretionary. In the absence of a contract with the prosecutor for the occupation of this pew, the vestry was not legally bound to find or assign any reason for depriving him of the occupation of it. The power of the vestry to do with the pew whatever they saw fit by way of assignment of it, was not dependent upon any state of facts beyond their own will. *Stet pro ratione voluntas.* Where the power of removing an officer is discretionary, it may be exercised without notice or a hearing. 1 *Dill. on Mun. Corp.,* § 188; *Rex* v. *Mayor, &c.,* 1 *Lev.* 291; *Rex* v. *Coventry,* 1 *Ld. Raym.* 391; *Ex parte Hennen,* 13 *Pet.* 230. For instance, a clergyman may, by the canons of the church, repel a church member from the communion; the vestry or consistory, at the periodical letting of pews, make changes in the assignment of them to suit what they deem to be for the advantage of the church. If these acts can only be done for a reason, and after a hearing, and are subject to review by writ of *certiorari*, great confusion would be introduced into the affairs of ecclesiastical bodies. If the court, by its writ of *certiorari*, may require a hearing to be given and reasons to be adjudged, it may also be called upon to adjudge upon the sufficiency of the reasons assigned. In all religious societies there are ecclesiastical courts, and if injustice be done in these matters redress must be sought in those tribunals, under the rules adopted by the church for its government or that of its members. The farthest a court of law can go in matters of this kind is to the question of power —jurisdiction.

It is true that the vestry did, in the preamble to the resolution, assign a reason for the action in language calculated to give offence. But they had the power to do the act by a simple resolution, or by concerted action without a resolution and without a reason; and we cannot set aside their action because the vestry assigned a reason for it expressed in a manner which we may disapprove. A judgment of reversal on that ground would be a nugatory act. It would neither restore the prosecutor to his seat in the pew, nor restrain the vestry from assigning it to another. The vestry could again do the act they sought to accomplish by this resolution, without observing any formality.

The prosecutor also objects to another part of this resolution—that wherein the vestry resolves to decline to receive any further contributions from him for parish or other purposes. He asks a reversal on this ground, for the reason that by this resolution he may be deprived of his right of voting at parish elections. In fact, neither the resolution nor the execution of it will produce such an effect. By the canons of the church in this diocese, the right to vote at parish meetings is given to all male attendants of the church who are either communicants not under repulsion, or are the holders of seats in the parish church, or, where the seats are not rented, who have contributed to the support of the church in the way appointed in that parish. *Canons of the Diocese of New Jersey, title II., canon II.* The prosecutor is a communicant of the church, and is not under repulsion. As such, he will be entitled to vote at parish meetings, and be eligible to office in the church, notwithstanding this resolution may be carried into execution.

It is, moreover, observed that the resolution is simply declaratory of an intent, on the part of the vestry, not to receive the prosecutor's contributions; and it may fairly be presumed that if his qualification to vote depended on the fact of his contributing to the support of the church, he would not be disqualified if his contributions offered were wrongfully rejected by those in authority. At all events, the injury to the prosecutor in that respect is only apprehended 'and contingent.

On an appeal to the civil courts by a minister of the Scotch Episcopal Church, alleging that alterations had been made by the general synod in the canons of the church, inconsistent with its constitution and practice, which the appellant could not conscientiously obey, and in consequence thereof he might be liable to degradation from his office as minister, and thereby be deprived of its temporal advantages, the court held that it might refuse to consider whether the synod had the power to make the canons in question, no civil injury having in fact arisen.   *Forbes* v. *Eden, L. R.*, 1 *Sc. & Div. App.* 568, 575, 576, 582, 589.   For the same reason the Court of Appeals of New York refused a *mandamus* to restore the relator, who had been expelled from the congregation—but not, in fact, excluded from the church—by a resolution adopted in his absence, and without notice, the court holding that the resolution, if invalid, was nugatory, and would be no obstacle to redress for a civil injury whenever a civil injury should be sustained. *People* v. *Germ. U. Ev. Church*, 53 *N. Y.* 103, 110.

For the reasons above stated, the writ of *certiorari* should be dismissed.