M AND M WOOD WORKING CO. v. PLY-WOOD & VENEER WORKERS LOCAL UNION NO. 102 et al.

No. 9717.

District Court, D. Oregon.

Jan. 10, 1938.

Robt. L. Sabin, Jr., of Portland, Or., for plaintiff.

Ben Anderson, of Portland, Or., for defendants.

JAMES ALGER FEE, District Judge.

The court has under consideration the report of the Honorable Albert B. Ridgway, special master in chancery, selected by the opposing parties and appointed by the court and the exceptions which have been filed thereto. This report has been prepared with great care. This confusing field of law has been examined with keenness of insight and judgment and accurate guides have been thus furnished for the court.

The findings of fact are noteworthy for their clarity and accurate exposition of the evidence contained in the voluminous record which supports these findings in every detail. The court adopts the findings of fact as the findings of the court. A detailed statement of facts quoted from the master's report follow:

"This suit involves a controversy growing out of the operation of the Plylock plant by the plaintiff in the city of Portland, and which normally employs 515 persons. The plaintiff also operates a door plant and a wooden pipe plant in Portland, and another plywood plant in Longview, Wash. A substantial part of the raw material used in the Plylock plant is purchased from other states and from foreign countries, and 85 per cent. of its product is sold and shipped to other states and to European, South African, and South American countries. (195, 219).

"From the evidence and the exhibits introduced, it appears that on December 5, 1934, the employees at the Plylock plant organized, and obtained a charter directly from the A. F. of L. (Exhibit 27), the local being designated therein as Plywood & Veneer Workers Union No. 19487.

"On April 11, 1935, the United Brotherhood of Carpenters and Joiners of America —one of the International unions which comprises the American Federation of Labor—issued a charter (Exhibit 23), and assumed jurisdiction over the local at the Plylock plant, and it became known as Plywood & Veneer Workers Union No. 2531, affiliated with the United Brotherhood of Carpenters and Joiners.

"On February 1, 1936, a working agreement (Exhibit 5) between the Plylock division of plaintiff and 'Plywood & Veneer Workers Union No. 2531, Portland, Oregon, chartered by the United Brotherhood of Carpenters and Joiners, affiliated with the American Federation of Labor' was executed. The duration of this agreement was from February 1, 1936, to April 1, 1937.

"On March 16, 1937, negotiations for a new contract began (220), resulting in the execution of a comprehensive agreement between the plaintiff and its employees (Exhibit 1) relative to hours of employment, wages, and working conditions. The opening paragraph of this working agreement provides:

" 'The parties to this agreement are the Plylock Corporation, hereinafter known as the company, and Plywood & Veneer Workers Union No. 2531, affiliated with the United Brotherhood of Carpenters and Joiners, hereinafter known as the Union.'

"The pivotal provision in this agreement is found in paragraph I thereof, which reads:

" 'The company recognizes that all its employees are members of the union. The company recognizes the union as representing, for the purpose of collective bargaining, all of its employees except those acting as shift foreman and in the plant office, and not paid on an hourly basis, not at present in the union, or any replacement of such personnel. It is the desire of the

parties hereto that the employees covered by this agreement shall maintain membership in good standing in the union. In order that this desire may be effectuated, and in order that the union may discipline its members for the effective operation of this agreement, the company agrees to release from its employ any person who fails or refuses to maintain membership in good standing in the union.'

"While this closed shop provision of the agreement was naturally included at the request of the employees, as is evidenced from a study of the original draft (Exhibit 3, par. VII), submitted by the union to plaintiff, that portion of the paragraph material in the instant case reading, 'The party of the first part agrees to employ only union labor in good standing in Local Union No. 2531,' the evidence also shows that it was desired by the plaintiff corporation (234).

"In the original draft, paragraph XII reads as follows:

" 'The duration of this agreement shall be from May 7, 1937 to March 1, 1938, and during the life of this agreement no strike shall be caused or sanctioned by the union, and no lockout shall be entered into by the employer, until every possible method of settling the difficulties shall have been tried. This agreement can be amended or revised by either party by giving at least thirty (30) days written notice.'

"The terms contained in this paragraph were divided and incorporated into two separate paragraphs in the final draft (Exhibit 1), the appurtenant provisions of which read as follows:

" 'IX. During the life of this agreement no strike or walkouts shall be sanctioned by the union, and no lockout shall be entered into by the company, except in the event of clear breach of this contract, and until every peaceful method of settling the difficulty, shall have been attempted. It shall not be considered a breach of this agreement if the operations of the company are interfered with or picketed by a third party, and the employees covered by this agreement shall fail or refuse to go through said picket line, it being understood that at no time shall employees be required to act as strike breakers, go through picket lines, work under hazardous conditions created by armed guards, or handle products which the union has declared unfair to its members. It is further understood that the company will not be request-

ed by the union to participate in any dispute regarding jurisdiction, which may arise between the union and any other labor organization.

" 'X. The duration of this agreement shall be from May 3rd, 1937 to March 1st, 1938. Exhibit A shall become effective April 1, 1937. When either party to this agreement desires to enter into negotiations or modifications of the wage scale set out in Exhibit A, he shall give written notice to the other party of such desire, and any modification so negotiated shall not take effect for ninety (90) days from the date of such notice, whenever the notice is given, and irrespective of the expiration date of this agreement. All other terms and conditions of this agreement shall remain in full force and effect for the entire period of this agreement, unless amended or altered by mutual agreement of the company and the union.'

"This contract was executed on behalf of the Plylock Corporation by its vice president, and by the union by its president, by the Plywood District Counsel by its vice president, its secretary, and a third member, and attested by the recording secretary of the union. The contract also shows the signature of United Brotherhood of Carpenters & Joiners of America, by B. W. Sleeman, who, from the testimony, appears to be the business agent or local representative of this international.

"It is significant that while the contract as originally drafted permitted of amendments or revision by either party, as finally drafted its terms and conditions could not be changed except by mutual agreement.

"The evidence also discloses that the defendant employees of the Plylock plant, with full knowledge of the terms of the above-mentioned contract, and likewise informed that plaintiff was insisting upon compliance therewith, voluntarily relinquished their membership in the United Brotherhood of Carpenters & Joiners, affiliated with the American Federation of Labor, and organized and joined another local union, affiliated with the International Woodworkers of America, which international bore the same relationship to the Committee on Industrial Organization as did the United Brotherhood of Carpenters & Joiners to the A. F. of L.

"All of the defendants admit that they have both failed and refused to maintain membership in good standing in the Ply-

wood & Veneer Workers Union No. 2531, affiliated with the A. F. of L., and by reason of such action left the latter Local without any officers, funds, or records, and with an unidentified membership of between forty and fifty members.

"With the aid of Mr. Bert Sleeman, the local representative of the Brotherhood, Local 2531 was reorganized by some twenty-nine of the old members, the Brotherhood returning to them the charter (Exhibit 23) issued April 11, 1935. Since the reorganization, they have proceeded to conduct their affairs, comply with the terms of the contract of May 3, 1937 (Exhibit 1), and to accept provisionally members in accordance with their charter and by-laws.

"By the latter part of August, 1937, many of plaintiff's customers had learned that the majority of the employees of the Plylock plant had "gone C. I. O." They promptly advised the plaintiff that they could not handle its products (Exhibits 6 to 13). The United Brotherhood of Carpenters & Joiners, speaking through its Pacific Coast representative, telegraphed plaintiff, declaring a boycott of its plywood products.

"Faced with these conditions, and with business declining at an alarming rate, plaintiff on September 8th, closed its plant.

"In the meantime members of the executive committee of Local 2531 conferred with officers of the plaintiff corporation. At one of these meetings, held Saturday, September 11th, the committee requested a written statement of plaintiff's position. Pursuant to this request, Mr. Neil Malarkey prepared a three-page statement (Exhibit 15), which was delivered to Mr. Dodge, and same was read at a meeting of Local 2531 held on the same date (264).

"This document, after quoting in full that provision of the contract of May 23, 1937, requiring the Plylock plant to release from its employ any person failing or refusing to maintain membership in good standing in Local 2531, affiliated with the United Brotherhood of Carpenters and Joiners, and the further provision that the company would not be requested to participate in any disputes regarding jurisdiction between the unions and any other labor organization, contained this statement:

" 'In view of the provisions of our contract, and the provisions of the Wagner Act, and the definite advice we have from our lawyers, which is agreed to by the leading labor attorneys of this city, we are required by law, and shall employ in our Plylock plant and M & M Plywood plant, up to the termination of our contract, which is March 1, 1938, only men who maintain membership in good standing in Plywood & Veneer Workers Union No. 2531, as far as Plylock is concerned. * * *

" 'We have so informed the executive committee of the two locals, and have so advised the representative of the affiliate of these two locals, the United Brotherhood of Carpenters and Joiners. If sufficient men with membership in good standing in locals of the two plants are available, we expect to operate both the Plylock plant and the M & M Plywood Corporation plant. Under existing circumstances we are asking the representative of the United Brotherhood of Carpenters and Joiners to certify to us the members of the two locals in good standing before commencing operation.'

"On September 12, 1937, Plywood & Veneer Workers Local Union No. 102 installed its charter (1145), and on the following day addressed a communication to plaintiff corporation (Exhibit 17), to which was attached copy of a resolution, and in which plaintiff was notified that 'Plywood & Veneer Workers Union Local 2531, formerly of the United Brotherhood of Carpenters and Joiners, affiliated with the A. F. of L.' had become 'Plywood & Veneer Workers Local Union No. 102, affiliated with the International Woodworkers of America of the C. I. O.; that all agreements of this organization with employers, under the former name, are hereby ratified, accepted and adopted as the agreement of this local union.'

"On October 6, 1937, plaintiff, believing that there was sufficient business for a small operation, reopened its plant, and all members maintaining membership in Local 2531 who applied for employment were put to work, the operation continuing through October 7th and 8th.

"At this time conditions had become acute, and it being apparent that the police force delegated to protect the plant could not handle the situation (495), the officers of the plaintiff corporation concluded to and did close the mill on Monday, October 11th, at noon.

"On Thursday, October 14th, plaintiff filed its complaint, wherein, after alleging many of the facts herein referred to, it prayed that pending the final determination,

a temporary injunction be issued, enjoining the defendants from picketing plaintiff's plants, and from inflicting or threatening to inflict injury of any nature to the person or property of the plaintiff or its employees, and from interfering with the plaintiff in the performance of its business.

"On October 23, 1937, the court being then engaged in the trial of a case, and it appearing that there was need for immediate action upon the issues presented by the pleadings in this case, it was referred to me as a special master in chancery, with instructions to take testimony, make findings of fact, and draw conclusions of law on the issues raised by the pleadings relating to the application of the plaintiff for a temporary restraining order, and to recommend to the court a proper order to be entered therein.

"Pursuant to this order, the taking of testimony was commenced October 25th, and was concluded on November 5th, the testimony covering some 1,500 pages.

"It must be admitted that the business of plaintiff is almost entirely interstate in character. While its local factory is located in Portland, Or., a large portion of its raw materials come from Washington (186), and some even from Tennessee (187), the Philippines (185), and Poland (187). Its glue is imported from Washington, New York, Pennsylvania, and Belgium, at an average annual cost of $160,000 (186), and its craft paper from Port Angeles, Wash. (188). The peeler logs come into plaintiff's plant in Portland, and are there manufactured into plywood, 85 per cent. of it being sold and shipped across the Oregon state line to other states (219) by rail and by boat (250), and to European, South African, and South American countries (195). It was also shown that the plaintiff manufactured and sold 70 per cent. of all plywood manufactured in the Columbia river area (214).

"The evidence in the instant case (405–410) shows that on October 9th, five days before the complaint was filed, an effort was made to 'spot' a railroad car in plaintiff's plant, destined for Detroit, Mich. (328), and failed because of the acts of intimidation and violence committed by pickets surrounding plaintiff's plant, many of whom were identified as former employees, and members of defendant union.

"The testimony of A. E. Blackburn (317–331) and of J. F. McDonough (380–

389), railroad employees, describe in detail the throwing of rocks and other methods used. B. E. Soule, a Union Pacific switchman, testified (350) that he was threatened by some of the defendants that if he 'spotted' a freight car in the plaintiff's plant he would get his 'neck in it,' and that they would 'attend' to any railroad employee who 'spotted' a car (317–331).

"Plaintiff's chief millwright, Clyde Miller (409), describes the action of a member of defendant union, a former employee, Don Muck, in standing directly in front of the switch engine with a three-year old child (413) in one arm, and a banner in the other, and saying to the train crew and those in the vicinity, 'Now I would like to see them go through here' (414). Subsequently, on cross-examination by one of defendants' counsel, we find the following:

" 'Mr. Anderson: Q. But in order to move the car the engine would have had to move backwards? A. The engine would have had to move forward first in order to get through the switch.

" 'Q. In order to get through the switch? A. Yes, sir. He (referring to Don Muck) was attempting to prevent the car going through the switch.' (440).

"Counsel for defendants argues that these facts did not prove an interference with interstate commerce. The fact remains that this freight car, destined for Detroit, Mich. (328), instead of being 'spotted' in plaintiff's plant, was returned to the Albina railroad yards (383).

"This evidence convinces me that the defendants were clearly obstructing plaintiff's effort to make interstate shipments, and that these particular acts on the part of the defendants had a more direct effect on the sale or transit of materials in interstate commerce than they did on the local manufacture of plywood. These acts were clearly intended to have, and they did have a direct, material, and substantial effect on the stream or free flow of interstate commerce, and leave no doubt as to the intent with which they were performed."

■■ A combination and conspiracy to restrain interstate commerce followed by an actual interference with traffic of this type is established. The complaint and the evidence clearly lay the basis for relief under the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, and the Clayton Act, 38 Stat. 730, if subsequent legislation as to labor does not forbid. Since it is the rec-

ommendation that temporary injunction issue, not only the conclusions of law but the entire field of policy and jurisdiction must receive independent consideration by the court.

The court of equity should consider not only strictly legal rights but the attitudes and positions of the embattled unions, the situation of the employer, and the convenience, safety, and well-being of the people of the state of Oregon, to which, without class distinction, each of these individuals belongs.

The irresponsibility of the unions and their members and their inattention to claims of the public, when pitted against each other, is clearly exemplified by the record of these persons who have withdrawn from the group united with the American Federation of Labor and have avowed allegiance to the Committee for Industrial Organization. The moral responsibility which holds persons to the carrying out of private and social engagements, irrespective of the legal sanction, has apparently been utterly destroyed in this group by bitterness of hatred toward another group of American workmen.

The record reeks with mass formations, intimidation, and violence. These were perpetrated by one faction for the purpose of obtaining an economic advantage over another. No cause, however sacred, justifies such callous indifference to humane instincts. But these measures were motivated not by devotion to religious faith or a sublime altruism, but by gross desire of gain or greed for power.

The people of this state have suffered by this attitude of which the incidents portrayed in this record are only sporadic reflections. The court takes judicial knowledge of the stagnation of trade, the atmosphere of fear and oppression, the inconvenience, want, and actual danger which has resulted from this war undeclared but ever present. For months this conflict of the warring unions has raged unchecked in this state. The public interest which is paramount has been disregarded.

Advantage has been taken of the fact that the workers had the sympathy and cooperation of the public at large and members of legislative and other governmental bodies in the effort to free themselves from predatory machinations of unreconstructed employers. By the bitter struggle for mastery, this sympathy may be transmitted into disgust.

In any event, this court must consider primarily the public welfare rather than the rights of individuals, even in a case which involves private litigants only.

The interests of those individuals who remained loyal to the American Federation of Labor must be also kept in mind. They stand upon the same plane as the dissenters. Their right to work must be protected as well as that of the secessionists. They are insisting that they are employed under a closed shop contract entered voluntarily not only by themselves but by all who have now withdrawn. The contract for exclusive employment of members of a specified group has long been a goal sought by labor through years of industrial strife as the palladium of liberty of contract. The loyal` employees should not be subjected to fear, intimidation, and personal violence because they believed in reciprocity in such an agreement and in carrying out its terms whether it was legally binding or not.

In situations where the employer is taking advantage of his position to arbitrarily and unreasonably refuse proper adjustments of the wage scale or the terms, hours or conditions of employment, or where he has attempted to prevent proper representation of employees as has too often happened in the past, the courts should deny him relief. But in this transaction all these factors had been held satisfactory by the whole group of employees. After the secession of the dissenting members, there was an attempt upon their part to renew employment upon the same basis. By the action of the dissenting members, the employer without its fault was placed between two fires. If it acceded to the position of the secessionists, it was faced with a boycott of its products. If it held with those who remained in the union as first constituted, it faced the conditions developed in this record. The plaintiff could not appeal to the National Labor Relations Board because Congress had not given it this right. The appeal to the courts was seriously circumscribed. This type of agreement was expressly approved by the Wagner Labor Relations Act, 29 U.S.C.A. § 151 et seq. Yet in this situation there was apparently no turn the plaintiff could make without loss and damage and through no apparent fault of its own.

So far the situation has been viewed without reference to the legal rights under

the contract. An interpretation of the agreement and the rights of all the parties will now be sought.

By concurrence of all the employees of plaintiff at this plant a contract was entered between the employer and "Plywood & Veneer Workers Union No. 2531 affiliated with the United Brotherhood of Carpenters and Joiners," an American Federation of Labor unit. The duration of the contract was one year. An essential term of the agreement was that the plaintiff should release from its employ "any person who fails or refuses to maintain membership in good standing in the union." This type of agreement is sanctioned by the historical development of the labor movement as one of the most valuable guarantees of economic freedom of the workingman. The decisions of the courts recognize this fact. The Wagner Labor Relations Act seals this form of agreement with approval. If the National Labor Relations Board had designated this union as the bargaining agent, then the agreement would have been enforced by the courts by all proper powers, including injunction. Oberman & Co. v. United Garment Workers of America, D.C., 21 F. Supp. 20.

The able opinion of the special master correctly sets out the rights and obligations arising from this contract. The agreement had legal sanction even if the bargaining agent was not approved by the National Labor Relations Board after selection by the workers. The fact that it was entered by unanimous concurrence of the employees is unquestioned. It was binding upon plaintiff when entered. It should be held binding to-day. But mutuality and reciprocity of obligation are essentials of contractual relations.

The agreement when first entered was not only obligatory upon the Local 2531, an American Federation unit, but upon each individual member thereof. Furthermore, each member at that time had a property right therein and this right did not depend upon an action of the majority or any one except himself. Any one, it is true, could have lost the right by withdrawing from the union or from employment, or by failing to do those things which would keep his good standing in the union. Plaintiff also had a contractual and a property right herein. The union and its members were bound not to object for a period of a year to the wages, hours, conditions, or terms of employment to which they had agreed. Plaintiff had the right to have the employees either remain in good standing in the union, an affiliate of the American Federation of Labor, or to permit the discharge of any who did not do so without difficulty. It had contracted for industrial peace for a year so far as these men and this union were concerned on the basis of the facts disclosed in the record and the plaintiff should now have all the rights and be subject to all the liabilities of the contract.

Thereafter, not by reason of any difficulty with plaintiff but because of disgust over the domination of certain officers of the Carpenters & Joiners Union, certain members attempted to change the unit from one affiliated with the American Federation of Labor to one controlled and chartered by the Committee for Industrial Organization. Even courts know that these two parent associations are hostile and antagonistic. Therefore, even if there had been a unanimous secession, the organization chartered by the Committee for Industrial Organization would not be the same as the original unit chartered under the auspices of the American Federation of Labor with which plaintiff had a contract. The attempt of the association chartered by the Committee of Industrial Organization to adopt that contract and to take advantage of its terms while it proves there was no conflict between the men and the plaintiff cannot avail. There was no assignment. Plaintiff did not nor was it bound to accede to such a metamorphosis.

But it is contended that the unit of the American Federation of Labor thereby ceased to exist and thereafter no contract existed. But the withdrawal of the members did not necessarily destroy the association. The Carpenters & Joiners Union had authorized the association. An alien unit could not destroy that association without the consent of the parent union. If one member remained loyal, the Carpenters & Joiners could keep the charter in effect for the sole purpose of holding plaintiff to the contract. The mere fact that a rule of the parent union established a number of men which should hold the charter did not require it to accept destruction of the unit to play into the hands of the Committee for Industrial Organization. The rule was for the convenience of the parent organization and the failure to comply with the rule could have been waived.

■ Irrespective of whether the unit of the Carpenters & Joiners remained in existence or not the dissenters claimed strongly that the contract was that of the individuals who were working for the company when the agreement was drawn. If the union is no longer in existence, none of the men are members; if the union is still in existence, none of those who seceded are members. By failure to keep membership in good standing in the union, each of the dissenters has required by his own contract plaintiff to discharge him. He did not, it is true, break the contract, but he has compelled plaintiff to discharge him unless plaintiff was to violate its own engagement.

Notwithstanding the position of the dissenters is entirely unreasonable and illegal, they nevertheless have urged this interpretation of the contract upon the employer by all means in their power. The question is whether under the legislation enacted by the Congress of the United States jurisdiction is thereby removed from this court to issue an injunction.

Prior to the passage of the Wagner Labor Relations Act, this court held that the tendency of national legislation was to require the settlement of disputes affecting labor by mediation and administrative action. This court held, construing the Norris-La Guardia Act, 29 U.S.C.A. § 101 et seq., together with other legislation and executive action then current, "The provisions of the National Industrial Recovery Act, the codes as agreed to pursuant to its terms, and the executive orders setting up the National Labor Boards and the Regional Labor Boards evince an intention to have Industrial disputes settled by administrative intervention." National Lumber Workers Union v. Tidewater Timber Company, unreported opinion of this court rendered April 30, 1934.

The court further at that time expressed the opinion that solution of industrial disputes would be so found, saying:

"The genius of our institutions is indifferent to the political developments in other countries. A thoroughly American solution is attempted by collective bargaining, varying neither to the right or the left, nor destroying the liberties or property rights engaged on either side."

The tendency noted by the court has been marked by the passage of the Wagner Act and the intention to further commit such disputes to administrative action is yet more pronounced. There is, however, a question as to how much jurisdiction was vested in the National Labor Relations Board.

■ In this case the secessionists, although they had filed a complaint with the Board, had been content to allow the controversy to run for many weeks. These weeks were marked by mass picketing and violence upon their part. Although the Board was thus vested with all the power to intervene which it now possesses, no motion was made by it to construe the contract and relieve the people of the state from the insensate strife. The power to settle controversy by administrative action carries with it the responsibility to act. After the court had taken jurisdiction and had referred the question of issuing a temporary injunction to the special master and after the master had made findings, construing the contract adversely to the defendants, the Board, which had allowed the controversy to rage unnoticed theretofore, accepted jurisdiction and held a hearing.

The situation has thus materially changed since the report of the master was promulgated. Furthermore, considerable time has elapsed and considerable testimony has been taken of which this court has not presently the advantage. This case has been set for final hearing in a few days.

■ The court is not grasping of jurisdiction. If the National Labor Relations Board has the power to act, this court will not interfere with or hamper its action no matter how long delayed. The Congress of the United States has written the laws and the court will meticulously follow the limitations.

As to the Norris-La Guardia Act, 29 U.S.C.A. § 101 et seq., the master held following United Electric Coal Companies v. Rice, 7 Cir., 80 F.2d 1, certiorari denied 297 U.S. 714, 56 S.Ct. 590, 80 L.Ed. 1000, that no labor dispute was here present and that temporary injunction should issue because the provisions of that enactment did not therefore apply. There is other authority for this view. However, this court has not as yet gone that far.

The court has held that where a third party, a member of the general public, who had no controversy with its own employees and who was not directly a party to a con-

troversy sought to enjoin a combination of defendants to interfere with products which it had shipped in interstate commerce or was handling as a carrier in interstate commerce the provisions of the Norris-La Guardia Act did not apply. This was the rationale of the decisions in California Brewers Institute v. Dave Beck, determination of this court without opinion, August 14, 1937, and Waterfront Employers of Portland v. Committee for Industrial Organization, unreported opinion of this court rendered January 15, 1938. In each of these cases, there apparently was a jurisdictional controversy between larger unions in which the plaintiff was not directly involved. In each of the cases breach of contract with the employees of third persons was apparently induced.

The Norris-La Guardia Act did not contemplate specifically the jurisdictional controversy. The application of the act must usually be required where the dispute originates directly between employer and employee although it is specifically not so limited.

Where a third party is seeking to have goods transported in interstate commerce, it must be shown that if there is any labor dispute that the plaintiff has some interest in the dispute. Furthermore, it must be a "labor dispute," not a dispute between laborers. Notwithstanding the broad terms of the Norris-La Guardia Act, the intention cannot have been to prevent a member of the general public from obtaining proper relief when sustaining irreparable damage because a dispute to which he was not a party existed between unions. The act itself does not in words so extend the limits of such a controversy to third persons who are not interested therein but are damaged thereby. If it were otherwise, national paralysis might exist by the complete stoppage of interstate commerce.

But here the plaintiff is the employer and the dissenters are in any event former employees. Whatever may be the holdings of this court as to the right of third parties to obtain injunctive relief, it is certain these do not strictly apply here.

In view of the questions raised as to the construction of the Norris-La Guardia Act and the Wagner Act, the court should move with due care. The court should not grant a temporary injunction unless firmly founded in jurisdiction. The court will not at this time determine these jurisdictional questions. It is certain, however, that if the jurisdictional prerequisites to the issuance of an injunction had been present in the pleading and supported by the facts, the court would have had power to act.

In the record before the court it seems clear that sufficient evidence has been adduced so that every finding required by the Norris-La Guardia Act could be made if the pleading had contained appropriate allegations. The court grants permission to amend the complaint in accordance with the statute. If this amendment is not made, no temporary injunction will issue. The court will, however, upon final hearing definitely consider the questions of jurisdiction, whether the amendment be made or not, and make appropriate disposition of the cause.

The motion for temporary injunction is therefore denied for the present with leave to renew upon amendment of the pleading, as indicated, if plaintiff be so advised.