The complainants, members of Mt. Zion Baptist Church of Newark, sue not only for themselves but in behalf of all members of the church who may join in the suit. The amended bill of complaint prays for relief in three branches: (1) That the purchase of property on Broadway at Kearny Street be voided and the defendants account for the moneys of the church used in the purchase; (2) that the election of church officers December 19th, 1945, be declared illegal and a new election be held under supervision of a master appointed by the court; (3) that the resolution of the congregation for the sale of the church on Thomas Street, be set aside and the defendants be enjoined from consummating the sale. When the day for hearing approached, it appeared that another suit was pending between the parties to test the legality of the purchase of the Broadway property and that a stipulation had been made that the question of buying the property be resubmitted to the congregation and that all parties abide by the result. Accordingly, this branch of the case was withdrawn. It also appeared that at the election in December, 1945, the officers were chosen for only one year and that the question of the validity of their election would become academic before the suit could be decided. So the only problems considered at the final hearing related to the sale of the Thomas Street property.
The Mt. Zion Baptist Church was formed many years ago and was incorporated in 1885 under the provisions of the Religious Societies Act of 1876, Rev. p. 957 §§ 48 to 57, now found in amended form in R.S. 16:2-1 et seq. In 1907, the church bought a plot 100 feet square on Thomas Street in the southerly part of Newark, and there erected a substantial church edifice. This was the home of the congregation for nearly 40 years. In 1944, a large and handsome church located on Broadway in the north end of the city, three miles from Thomas Street, was offered for sale at a small fraction of reproduction cost. Despite the fact that three-quarters of the members lived in the vicinity of Thomas Street, the Mt. Zion Church bought the Broadway property and began holding *Page 607 
its services there November 1st, 1945. But a large part of the congregation continued to use their accustomed place of worship on Thomas Street. Much tension developed between the two groups.
The congregation, at a meeting September 19th, 1945, decided "that the present site, 186-190 Thomas Street, be put in the hands of the trustees for sale; that the funds from sale be transferred into an apartment house to relieve the congested condition of our people." In November, a joint session of the deacons and trustees voted to recommend to the congregation acceptance of an offer of $22,000 received from the New Point Baptist Church. The annual meeting of the church was held at Broadway December 19th. The notice of the meeting stated "that the Trustees will present a proposal price for the property 186-190 Thomas Street. All members are notified to be present to vote upon the proposal." On December 19th, officers were elected and much business done but consideration of the sale was laid over to December 28th, to which day the meeting adjourned.
On December 28th, the pastor, Rev. James H. Burks, informed the meeting that he had two offers for the property. Robert W. Powell, one of the trustees, then read the offer of $22,000 from the New Point Baptist Church and an offer of $10,000 from "the opposition group," namely, those still worshipping at Thomas Street, and the trustees' recommendation that the former be accepted. Several members attempted to ask questions or to discuss the business but were not permitted to do so by the moderator, Mr. Burks. Tellers were appointed and a vote was taken by show of hands: first those in favor of the one proposition, then those in favor of the other; the noes were not called for. The junior choir was rehearsing when the meeting began but before the vote was taken, the children entered the auditorium, 50 to 100 of them, and voted for acceptance of the New Point proposal. Including the children, that offer received 152 votes and the other offer 92 votes. This is the action which the complainants attack.
Was the business transacted in a proper and fair manner so that the decision of the meeting reflects the considered *Page 608 
judgment of the church? The pastor, Mr. Burks, and his followers who controlled the official boards of the church, well knew that a large part of the membership, unwilling to move from their old church home, desired to form a separate congregation and to acquire title to the Thomas Street property and wished to submit some proposition to that end. Yet no inkling of this important fact was given in the notice of the meeting. The notice does not even disclose the amount of the offer to be presented by the trustees.
The notice of a meeting should specify any business of an extraordinary nature or of great importance to be transacted.Height v. Democratic Women's Luncheon Club, c., 131 N.J. Eq. 450; Normandy v. Ind. Co-op. Co. (1908), 1 Ch. 84; Jones
v. Commonwealth Edison Co. (Ill.), 18 N.E. Rep. 2d113. The reasons for this requirement are to bring to the meeting the members who are interested in the proposed action, and to give opportunity for investigation and consideration in preparation for the meeting. Here the notice was sufficient to apprise the members of the general object of the meeting but did not enable them to think over in advance what action was proper. This defect in the notice, standing alone, would perhaps not be ground for disturbing the action of the congregation, but it must be considered in conjunction with the conduct of the meeting itself.
At the meeting no questions were allowed, no discussion permitted. There is testimony that the leaders of the two factions, or their attorneys, had agreed beforehand that there should be no discussion. But they had no authority to bind their followers or the congregation as a whole. In the absence of a specific regulation to the contrary, the ordinary rules of parliamentary law should be observed in the conduct of a meeting. The by-laws of the Mt. Zion Church direct that the meetings of the church shall be governed by Hiscox' Directory for BaptistChurches. The rules of order, contained in the directory, recognize the right of debate. For example, "Any member desiring to speak on a question should rise in his place and address the moderator, confine his remarks to the question, and avoid all unkind and disrespectful language." I have no doubt that the great majority of those *Page 609 
present at the meeting of December 28th, were anxious to make a right decision. They were entitled to hear the views of each other, especially as they had no advance notice of the terms of the offers on which they were about to vote. And the group who still worshipped at Thomas Street had a right to be heard in the hope that their arguments might convince the congregation.
The question has been argued whether it was lawful to receive the votes of the children. The statute merely requires for the sale of property "express authority from the Church itself."R.S. 16:2-8. As to infant's right to vote, generally, seeChicago Mutual, c., Association v. Hunt (Ill.),20 N.E. Rep. 55, and Bailey v. Y.W.C.A. (Pa.),109 Atl. Rep. 690. The question who may vote depends upon the rules and custom of the particular church. Den, ex dem. The American PrimitiveSociety v. Pilling, 24 N.J. Law 653. For each Baptist church is a self-governing body, independent of all other churches.Hiscox, p. 145. Yet there is a family-likeness among all Baptist churches, and hence a presumption that the Mt. Zion Church follows the practices commonly found in such churches. Persons who are under the age of 21 years are admitted to membership in Baptist churches. No rule requires that a certain age shall have been attained, although very young children are in fact excluded by the requirement that the applicant must give evidence of his conversion, must make a confession of faith, and must be leading a life outwardly Christian. Many minors are on the Mt. Zion membership roll. Hiscox states clearly that all members have equal rights with each other without distinction of age. The oral proofs confirm this statement although it is made to appear that many churches, acting by virtue of their independent authority, exclude the votes of minors under a certain age, or of members who do not contribute regularly to the support of the church.
Mt. Zion happily seems to have had a harmonious history until the present controversy began. The question who had a right to vote was not raised. Normally, children are not eager to attend church business meetings, or if present, are willing to let the decisions be made by their elders. I can *Page 610 
well believe that now and then a child joined in the chorus of ayes and that the two or three witnesses who testified that they voted while minors, spoke the truth. On the other hand, I believe that Mr. Bowles and others testified honestly and in substantial accord with the fact when they denied that children voted. It is my conclusion that Mt. Zion has no rule or definite custom on the subject and that until it shall adopt one, the usual Baptist practice governs and all members can vote whether or not they are under age.
Although minors have the right to vote, it is a right which has been seldom exercised in this church. At the meeting in question, the vote of the young people was a very important factor. Perhaps half a dozen children who came with their parents voted, some on one side, some on the other. This was normal. But the junior choir, 50 strong or more, were called to the church house for a special rehearsal that evening and then entered the meeting and voted — solidly for the New Point offer. This was the choir that sang at the Broadway church; it included none who had remained at Thomas Street. If the Thomas Street group had anticipated the unusual maneuver, they might have brought their own children enmasse, but they were taken by surprise. A distorted vote resulted.
Lastly, the members of Mt. Zion Baptist Church had the right, of which they were deprived, to vote against both propositions which were submitted to them. They might believe that $22,000 was too low a price. They might, on the other hand, consider that the price of $22,000 put so heavy a burden on the New Point Church that it would be unable to render effective Christian service in the south end of the city and therefore the price should be reduced. They might decide the Thomas Street building should be given outright to the group still using it, or even that it be not conveyed away at all but that Mt. Zion operate as a collegiate church with services in the two edifices.
For the reasons above stated, I conclude that the business was not so conducted that the approval of the New Point Church offer can be accepted as the judgment of the Mt. Zion Church. The attempted sale must be set aside. *Page 611 
The New Point Baptist Church is not at present a party to the cause, but only their pastor, Mr. Foote. After the hearing and while I was considering the cause, the New Point Church petitioned for leave to intervene as a defendant and to counter-claim for cancellation of its contract to buy the property and for a return of the deposit. The petition will be granted, especially as the New Point Church ought to be a party so that it may be concluded by the decree in the main suit. Cancellation of the contract would seem to follow of course, from my conclusions above stated. So, too, the deposit should be returned, except so far as it may be offset by a reasonable sum for the New Point Church's use of the Thomas Street edifice. In order not to delay further a decree on the principal issues, the deposit and all questions relating thereto may be dealt with by a separate decree after due hearing.
 *Page 1