10 N.J. Super. 26 (1950)
76 A.2d 89
WILLIAM H. HARKER, HOWARD G. WINTLING AND HARRY J. DUNN, IN THEIR OWN RIGHT AND FOR AND ON BEHALF OF ALL OTHER MEMBERS OF INDUSTRIAL UNION OF MARINE AND SHIPBUILDING WORKERS OF AMERICA, LOCAL NO. 1; AND INDUSTRIAL UNION OF MARINE AND SHIPBUILDING WORKERS OF AMERICA, LOCAL NO. 1, AN UNINCORPORATED ASSOCIATION, PLAINTIFFS-RESPONDENTS,
v.
JAMES C. McKISSOCK, ROBERT RULON, HERMAN SCHOMBER, ADOLPH F. PRYZWARA, THOMAS W. SAUL, JOHN J. KNOWLES, ROBERT E. KAVANAGH, WILLIAM R. ANDERTON, LESTER INVESTMENT COMPANY, A CORPORATION; AND SHIPBUILDERS EDUCATIONAL SOCIETY, A CORPORATION NOT FOR PROFIT, DEFENDANTS-APPELLANTS, AND NEW YORK SHIPBUILDING CORPORATION, ET AL., DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued August 21, 1950.
Decided October 25, 1950.
*29 Before Judges JACOBS, BIGELOW and WM. J. BRENNAN, JR.
Mr. F. Morse Archer, Jr., argued the cause for defendants-appellants (Messrs. Boyle, Archer & Greiner, attorneys).
Mr. M.H. Goldstein (of the Philadelphia Bar) argued the cause for plaintiffs-respondents (Mr. Barney B. Brown, attorney).
Mr. Albert B. Melnik argued the cause for defendant-counterclaimant, Industrial Union of Marine and Shipbuilding Workers of America.
*30 The opinion of the court was delivered by WILLIAM J. BRENNAN, JR., J.A.D.
On September 28, 1948, a meeting of approximately 700 members of Local No. 1, Industrial Union of Marine and Shipbuilding Workers of America, an unincorporated association, voted, with eight dissenting, to terminate the local's affiliation with the defendant national union. This suit, brought in the Chancery Division of the Superior Court, resulted.
The individual plaintiffs are local members who allege that the attempted secession was not legally effective and that the local remains a national union affiliate. The principal defendants, who are appellants here, are the individuals composing the local's official board in office at the time of the secession, and who continued thereafter to administer its affairs and property. The other defendants are the national union, New York Shipbuilding Corporation, employer of the local's members at its Camden yard, and the several depositaries of the local's funds and the holders of its properties.
The national union is a cross-appellant. Its answer joined in plaintiff's prayers for relief and added a counterclaim, dismissed by the trial court, alleging that if the secession was effective the national union is entitled to the local's property.
Temporary injunctive relief was denied. Harker et al. v. McKissock et al., 1 N.J. Super. 510 (Ch. Div. 1948). Plaintiffs prevailed at the trial and obtained the judgment under appeal restraining the official board's continued administration of the local's affairs and directing them to account for its assets, and granting incidental injunctive relief against the national union and the other defendants; and, as mentioned, dismissing the national union's counterclaim.
The trial court had no doubt of the local's power under the agreement to terminate the affiliation with the national union, but held that in the absence of a contract provision authorizing such action by majority vote, the power could be exercised only by unanimous vote.
The local was formed in 1933 to represent the shipbuilding employees at the Camden yard and its chief activity since that *31 time has been and continues to be the improvement through collective bargaining of the wages, hours and working conditions of the members of the local employed by New York Shipbuilding Corporation. The local had functioned for more than a year as an unaffiliated labor union when in September, 1934, it sponsored, and with two other shipyard workers unions from Chester, Pennsylvania, and Wilmington, Delaware (with which it had collaborated from the outset while all three were getting established), formed the national union for the purpose of spreading organization of industrial (as opposed to craft) unions throughout the shipbuilding industry. This is expressed in the preamble to the national union constitution:
"Recognizing that craft unionism, as practiced in the past, has been proved during the course of history to be both ineffective and dangerous to the interests of the workers, the Industrial Union of Marine & Shipbuilding Workers of America advocates and practices the program and tactics of militant industrial unionism based on the principle of One Industry  One Union."
It seems quite clear that the purpose of the affiliation was separate from, and not paramount, but subordinate, to the objects which gave birth to the local, although also in aid of those objects. A reading of the national union's constitution and the local's by-laws and the proofs that the local over the years and to the time of withdrawal largely handled all relations with the employer manifest that the local did not surrender its autonomy or independence to administer its own affairs and manage its assets to accomplish its original and chief purpose of advancing the welfare of its members as employees of New York Shipbuilding Corporation. The plaintiffs and the national union point to provisions of the local's amended by-laws mentioning the national union, but we find in them nothing to support the notion that the local surrendered its autonomy and became, as plaintiffs and the national union contend, a mere creature and dependent of the national union. On the contrary, we read the references as only such as might be expected to give effect to the alliance *32 while it exists, and not as impairing or restricting in any real sense the local's freedom of action to run its own affairs as it had before the affiliation and to retain its assets to further its members' interests in their relation with the employer, as the proofs show was in fact done by the local.
The members did not become members of the national union. They remained members of the local. The property of the local did not become the property of the national union. This property was and is the product of dues and initiation fees paid by the members to the local and is of very substantial value. The local's only financial obligation to the national union is the payment of a per capita tax assessed against and paid by the local and not by its members.
In our view the national union is simply a federation of autonomous locals. The relationship lacks the features which spell out a single integrated structure of which the locals are mere constituent parts, as in Federation of Insurance Employees, et al. v. United Office and Professional Workers of America, C.I.O., ___ R.I. ___, 74 A.2d 446 (Sup. Ct. of R.I. 1950); and Brown v. Hook, 79 Cal. App.2d 781, 180 P.2d 982 (Cal. App. 1947).
The facts surrounding the alliance and its origin have a striking resemblance to those considered in State Council of Jr. O.U.A.M. of New Jersey v. National Council of Jr. O.U.A.M. of North America, et al., 71 N.J. Eq. 433 (Ch. 1906); appeal dismissed, 79 N.J. Eq. 193 (E. & A. 1911). There the state council of a beneficial association was incorporated in New Jersey prior to the organization and incorporation of a national council, and the state council had played a part in the organization of the national council. The state council disaffiliated from the national council following a disagreement on policy. The national council attempted to set up a new state council and was restrained at the suit of the state council which was held to be fully autonomous and free to withdraw from the alliance and to continue possessed of its property as the only state council authorized to function in New Jersey. The national council unsuccessfully contended *33 that the state council was an integral part of the national council and inextricably intertwined and combined with it because of the references to the national council in the state council's constitution and the recognition of the national council's existence and authority, and of the facts that the state council had uniformly, by its delegates, taken part in the deliberations and proceedings of the national council and had paid to the national council the tax imposed by that body. The plaintiffs and the national union make substantially the same argument in this case, and we think it is equally ill-founded.
The alliance and its incidents are said to be a matter of contract. Thus it is held that whether a local union has power to withdraw is to be discovered in the contract formed by the constitution of the national union and the by-laws of the local union, considering also the surroundings under which the contract was made and the objectives which the parties sought to attain. International Union of United Brewery, Flour, Cereal, Soft Drinks and Distillery Workers of America, C.I.O., et al. v. Becherer et al., 142 N.J. Eq. 561; affirmed, 4 N.J. Super. 456 (App. Div. 1949); cert. den., 3 N.J. 374 (1949); Cameron v. International Alliance of Theatrical Stage Employees, etc., 119 N.J. Eq. 577 (E. & A. 1935). See, however, suggested alternative theories in a Note, "The Legal Consequences of Labor Union Schisms," 63 Harvard Law Review 1413 (June, 1950).
We may concede that a local union may lawfully contract to become a mere constituent of a national union or, also, no doubt, by its conduct in relation to the national union, be estopped to deny the contrary. The important determinant is not necessarily whether the local or the national union was organized first; their agreement and the history of their relations under it, with emphasis perhaps on the time at or near the schism, are also relevant. If the proofs showed that the national union carried on the bulk of the local's organization and negotiation activities and exercised substantial control of *34 the details of the administration of the local's affairs and funds, the local could scarcely make a pretence of autonomy.
That, however, is not this case. Here, as we see it, the local not only retained but continued its complete autonomy after the alliance and was empowered at any time at its free will and pleasure, although of course in a lawful manner, to dissolve the alliance and to resume its original independent existence with all its consequences. We think the local's power to disaffiliate is recognized in article IV, section 22 of the national union constitution which provides that "upon the dissolution, suspension, expulsion or termination of affiliation of any local," the local's assets shall automatically become the property of the national union. We are not impressed with the argument that this clause should be interpreted to inhibit diaffiliation because of the severity of the forfeiture penalty; the section plainly connotes recognition that the power exists; the penalty is nothing more than a strong sanction which it was doubtless hoped would operate to discourage exercise of the power.
The constitution, we should note, does not contain a provision familiar in many such instruments continuing the affiliation of the subordinate body when that is desired by a stated number of members, frequently seven or ten. Such provisions have been interpreted by some courts to have the effect of denying the majority the power to terminate the affiliation. See Liggett v. Koivunen, 227 Minn. 114, 34 N.W.2d 345 (1949).
We consider next the trial court's holding that although the local had power to disaffiliate, the power could not be exercised except by unanimous vote of the membership. There is no such requirement in either the national union constitution or the by-laws of the local. The local's affairs are ruled under the by-laws by a majority vote, except only that a two-thirds vote is required to approve investment changes or to approve expenditures from the local's emergency funds. A majority vote is all that is required to elect officers, amend the by-laws, to vote to start and terminate strikes, and to *35 approve or reject collective bargaining agreements; while the record does not disclose the vote at the time, we suppose that the original affiliation in 1934 and the by-law amendments which gave it effect required only majority action. Only the most cogent reasons would support a proposition that a unanimous vote is needed to terminate this affiliation, at best incidental to the basic objectives of the local's existence, when majority action suffices to control major decisions directly related to those objectives.
We have carefully examined the authorities relied upon by plaintiffs and the national union as precedents for the requirement of a unanimous vote. Many, like Brown v. Hook, supra, did not involve the question but were decided on contract provisions which expressly or as interpreted denied the subordinate body the power to disaffiliate. The rest turn on facts, not present here, which we think of controlling importance, that the attempt of the majority in each of those cases was not simply to disaffiliate and to carry on in an unaffiliated status, but to transfer the members and property of the subordinate body to another similar organization to the extinguishment of the former, or to divert its property to some other purpose. Altmann v. Benz, 27 N.J. Eq. 331 (1876); Great Council, etc., v. Mohican Tribe, etc., 92 N.J. Eq. 593 (Ch. 1921); Harris v. Geier, 112 N.J. Eq. 99 (Ch. 1932); Knights of Pythias v. Germania Lodge No. 50, 56 N.J. Eq. 63 (Ch. 1897); Schubert Lodge, etc., v. Schubert Kranken, etc., 56 N.J. Eq. 78 (Ch. 1897); United Public Workers v. Fennimore, 6 N.J. Super. 589 (Ch. Div. 1950); Low v. Harris, 90 F.2d 783 (C.C.A. 7, 1937); O'Neill v. Delaney, 158 N.Y.S. 665 (Sup. Ct. 1909); M. & M. Wood Working Company v. Plywood & Veneer Workers Union No. 102, 23 F. Supp. 11 (D.C. Ore. 1938); Seslar v. Union Local 901, Inc., 87 F. Supp. 447 (D.C. Ind. 1949).
These decisions it seems to us are not authority that a unanimous vote is required to effect disaffiliation when, as here, the entity remains alive and continues to function for its declared purposes and its property is retained in the continuing *36 control of the body and is devoted by it to its defined objects. On this state of facts, there being nothing contrary in the agreement, a majority vote is sufficient to effect a withdrawal. Vilella et al. v. McGrath et al., 136 Conn. 645, 74 A.2d 187 (Sup. Ct. Errors 1950). This is the view implicit in the decision in the Becherer case, supra, although it would appear the issue was not directly raised.
Logic supports this conclusion. This local is an organization whose membership was numbered in many thousands during the wartime shipbuilding boom and still aggregated 3,294 at the time of the secession. The membership is necessarily continuously undergoing change according to the needs of the Camden yard for employees. The virtual impossibility of a unanimous vote on almost any subject is apparent. The difference between an organization of this character and a religious or fraternal order of relatively small and stable membership is obvious; dues-paying labor union membership very often is in obedience to union security clauses in collective bargaining agreements requiring such membership as a condition of employment; there is such a requirement in the contract between this local and New York Shipbuilding Corporation; this suggests the question whether membership in such circumstance is as voluntary as in the case of the religious or fraternal society. A requirement for unanimous vote to terminate an affiliation under the circumstances presented in this case is unrealistic, certainly not in step with the practices of our day in the government of labor unions, and has the practical effect of denying the existence of the power to disaffiliate. Such a principle cannot be justified where autonomy is evident and the disaffiliation does not involve the death of the subordinate body or the diversion of its property or funds from the trusts for which the membership created them.
Plaintiffs and the national union argue that in any event the resolution of September 28, 1948, was not lawfully adopted because the notice of that meeting was legally insufficient to advise the membership of its purpose. A discussion of this *37 point requires an outline of the events leading up to the meeting.
The discord between the local and the national union grew out of a practice of the national, finally objected to by the local, of affiliating locals of workers in fields unrelated to the shipbuilding industry. The national union had admitted locals of attendants at mental hospitals, gas station attendants, fertilizer workers, railroad workers, watchmakers, workers in plumbing supply manufacturing, social service workers and turnkeys in federal penitentiaries. The dispute came to a head at a national union convention in February, 1948, when the local's delegates fought unsuccessfully to prevent the seating of delegates of metal workers locals. The delegates' position was that the practice was a departure from the principle "One Industry  One Union," and a violation of the national constitution creating a threat to the shipbuilders' control of their union. The secession step followed, initiated in July, 1948, by petition of 1,029 local members demanding a general membership meeting to act on a proposal to withdraw from the national union. The local's by-laws require the holding of such a meeting upon petition of 100 members.
A meeting attended by more than 2,000 members was held in an open air ball park on July 30th and referred the matter to the official board for study and later report to the membership. The official board gave thought to the several problems entailed in the proposal, one of which of evident importance was the effect of disaffiliation upon the local's collective bargaining agreement with New York Shipbuilding Corporation. The board concluded to attempt a compromise with the national union and proposed that the constitution of the national union be amended to establish autonomous divisions of shipyard workers, railroad workers and metal workers, under a plan to assure the protection of the interests of the shipyard workers. The national union made no response to the proposal which meanwhile the official board had reported upon at general membership meetings held on August 19th and September 16th. The last meeting had voted to hold another *38 membership meeting on September 28th to act on the proposed local budget for the ensuing period. The official board on September 24th, after discussion with the strategy committee of the local, decided to amend the agenda of the September 28th meeting to add the matter of disaffiliation. The board caused an amended notice of the meeting to be posted. The notice contained no mention of disaffiliation specifically but the subject was intended to be covered by the wording "discussion and action upon a report by the Official Board regarding current problems of the local."
The appellants contend that this wording, together with certain loudspeaker announcements made on September 28th, sufficiently advised the membership that disaffiliation was the subject intended to be discussed and acted upon, and argue that the attendance of 700, which was five or six times larger than the average attendance at meetings, shows that this is so. The trial court thought, however, and we concur, that the notice was inept for the purpose. But see Harker v. McKissock, supra, at p. 529. While technical nicety is not necessary, the notice must state what is fairly intended in order to bring to the meeting the members who are interested in the proposed action, particularly when that action is of the extraordinary nature of disaffiliation. Vilella v. McGrath, supra; and see Height v. Democratic Women's Luncheon Club of N.J., Inc., 131 N.J. Eq. 450 (Ch. 1942); Randolph et al. v. Mount Zion Baptist Church of Newark, N.J., et al., 139 N.J. Eq. 605 (Ch. 1946).
The irregularity, however, was cured by subsequent ratification by the membership of the disaffiliation resolution. An assembly may ratify any action which it has the power to authorize in advance, in which case the ratification relates back to the date of the action ratified. Page v. Asbury Methodist Episcopal Church, 78 N.J. Eq. 114 (Ch. 1910). We have already stated our view that the local had power to disaffiliate; it follows that the membership could ratify the action taken at the September 28th meeting.
*39 Ratification was accomplished in a formal manner at a meeting held December 1, 1948, the stated purposes of which, as appears in the notice thereof, included the purpose "to discuss and by appropriate action to reaffirm the disaffiliation of Local No. 1 from the National Union." The vote at this meeting to adopt the ratification resolution was unanimous with one member present abstaining. There is also evidence of other acts of the membership disclosing that the large majority favor disaffiliation; a membership meeting on October 21st adopted extensive revisions of the by-laws to implement the disaffiliation; there were proofs that over 90% of the membership signed ratification petitions dated October 7th; most of the local's officers who led the secession movement were returned to office in elections held in January, 1949; in July, 1949, the membership at a referendum by secret ballot voted to affiliate the local with International Brotherhood of Boilermakers, Iron Shipbuilders and Helpers of America, American Federation of Labor; and, finally, we are advised in the briefs of both sides that after the entry of the judgment on appeal a certification election was conducted by the National Labor Relations Board and the local, as a Boilermakers' affiliate, defeated, by a vote of 2,373 to 1,706, the group sponsored by plaintiffs and the national union.
There remains for consideration the national union's cross-appeal that if the secession succeeded its counterclaim was improperly dismissed and it is entitled to judgment awarding it the local's property under article IV, section 22, previously mentioned, of the constitution of the national union which reads in full as follows:
"Upon the dissolution, suspension, expulsion or termination of affiliation of any Local or Division from this Union, the Charter, Seal, and all monies, books and property of that Local or Division shall automatically become the property of the G.E.B. and the Officers of that Local or Division shall be responsible for their immediate transfer to the G.E.B."
There would be no question of the seceding local's right to the property except for this clause. Schweitzer v. Schneider, *40 86 N.J. Eq. 88 (Ch. 1916); affirmed, 86 N.J. Eq. 256 (E. & A. 1916). We are thus called upon to decide whether the clause is enforceable. The Note, supra, 63 Harvard Law Review, at page 1416, comments that "There has been a long history of judicial hostility to forfeiture clauses in union schisms." This apparently has been based on the view that the enforcement of such clauses has a confiscatory effect. Scott v. Donohue, 93 Cal. App. 126, 129, 269 P. 455, 457 (1928).
We are not told whether the clause was bargained over at the time of the affiliation in 1934. Cf. Moyer v. Butte Miners' Union, 232 F. 788 (D. Mont. 1916). At the time of the schism, however, the membership was almost entirely of employees of New York Shipbuilding Corporation who were required under the collective bargaining agreement between that company and the local to maintain dues-paying membership as a condition of employment. This suggests some doubt whether membership at that time was completely voluntary; at least the probability is that the members' interest lay largely in the features of membership affecting employment rights and status and not in the details of affiliation.
The effect of enforcement upon the freedom of choice of representatives assured by law to the local members as employees of New York Shipbuilding Corporation is another factor. We have noted that the local's status as exclusive representative has again been confirmed following the entry of the judgment on appeal at a certification election conducted by the National Labor Relations Board under the applicable federal statute. The members of this local as employees of New York Shipbuilding Corporation are guaranteed by federal law and our State Constitution (Art. I, par. 19) the right to organize and bargain collectively and with that right a corollary freedom of choice of their representatives. The consequence of depriving the local of its property are obvious. The local's representative status over the years has been given substance and vitality through the possession and use of the funds and property contributed by its members for the purposes of the representation. The loss of these funds and *41 property would threaten impairment, if not the throttling, of the local's performance of its representative functions and its organizing and bargaining ability. The inevitable result may be a deterrent effect on the employees' right of a free choice of representatives. This suggests the question, should the clause be viewed as an illegal impediment to the exercise of the employees' assured freedom of choice where their contract of employment requires their membership in the local and enforcement of the clause threatens to incapacitate the local from performing the very duty for which it was constituted?
But we need not pursue the matter so far. We have emphasized that the property of this local is the product of dues and initiation fees contributed by its members, and that it has at all times been and still is being devoted by the local to the discharge of its function as collective bargaining agent of the members as employees of New York Shipbuilding Corporation. The trust in which the property is held and its continued application to the purposes thereof have been clearly shown. These facts establish that the clause as phrased is plainly unenforceable under the principles laid down in State Council of Jr. O.U.A.M. of New Jersey v. Enterprise Council No. 6, 75 N.J. Eq. 245 (E. & A. 1909); Grand Court of Foresters of America v. Court Cavour No. 133 et al., 82 N.J. Eq. 89 (Ch. 1913); affirmed, 83 N.J. Eq. 343 (E. & A. 1914), which hold that forfeiture clauses such as this will not be enforced where the assets sought to be forfeited were contributed by the members to be used for their own purposes and benefit, and not for the purposes of being turned over to another organization for the benefit of other persons, when neither that organization nor other persons are under any obligation to hold the assets for the purposes for which they had been contributed, and when, as we have said is the case here, the assets are in fact being retained in the continuing control of the body and its members and are being devoted by it to its defined objects. "Forfeitures are not favored. They certainly will not be enforced where enforcement must *42 incapacitate the corporation from performing the very duty for which it was constituted." Grand Court, etc., v. Court Cavour, etc., supra, 82 N.J. Eq., at p. 96. The same may be said of an unincorporated association. See Schweitzer v. Schneider, supra, and International Union, etc., v. Becherer, supra, 4 N.J. Super. 456.
Neither section 22 nor any other clause of the constitution obligates the national union to employ the forfeited property for the benefit and purposes of the local's members; as far as appears the property goes into the general fund of the national union subject to be disposed of according to its rules. This is the feature which distinguishes the section from the forfeiture clause enforced in State Council v. Sharp, 38 N.J. Eq. 24 (Ch. 1884), concerning which decision it was said in the Enterprise Council case, supra, at pages 255-256:
"The case differs very materially from State Council v. Sharp, 38 N.J. Eq. (11 Stew.) 24, where the complainant's constitution provided that the amount received by the state council upon dissolution of the subordinate council should be appropriated for the assistance and support of the widows and orphans of members of the subordinate council, and that if there were no such widows and orphans, the amount should be invested and paid in case of reorganization to the subordinate council. In that case the subordinate council disbanded and undertook to divide up its funds, contrary to the scheme under which they had been raised, and the state council was seeking to enforce the trust created by the contributors to the fund, not as in the present case to work a forfeiture of the rights of the cestui que trust."
The national union urges that Fidelity, etc., Co. v. Brotherhood of Painters, etc., 120 N.J. Eq. 346 (E. & A. 1936), is authority that the forfeiture clause is enforceable. That case is not in point. The local there was not autonomous but a constituent and, as the court said, was "defunct" as a consequence of action duly taken by the international union which created it.
The judgment on the complaint is reversed, and is affirmed on the counterclaim. No costs will be allowed appellant on the appeal.
JACOBS, S.J.A.D., concurring.
I agree there was power to disaffiliate without unanimous vote and that although the *43 original notice of meeting may have been defective there was sufficient ratification by subsequent events. I am troubled, however, by the conclusion that the contractual language in article IV, section 22 to the effect that upon termination of affiliation the local's property shall automatically become that of the national is not to be given any effect. Courts ordinarily enforce the contractual undertakings of adults and, in the absence of compelling public policy to the contrary, this would lead to enforcement of the terms of the article. Cf. United Public Workers of America v. Fennimore, 6 N.J. Super. 589 (Ch. Div. 1950). However, I bow to the apparently controlling views expressed by our court of last resort in State Council v. Enterprise Council No. 6, 75 N.J. Eq. 245 (E. & A. 1909); Grand Court v. Court Cavour, 82 N.J. Eq. 89 (Ch. 1913); affirmed, 83 N.J. Eq. 343 (E. & A. 1914).
BIGELOW, J.A.D., dissenting.
A court should not refuse to enforce a contract except on very clear grounds, for our whole economy  our American system  is built primarily upon contractual obligations voluntarily assumed.
The men who constitute Local No. 1, which was formerly affiliated with the Industrial Union of Marine and Shipbuilding Workers of America, agreed for a sufficient consideration that upon the happening of a certain event, all money and property of the Local should become the property of the Industrial Union. The event has happened and the promissors are unwilling to yield effect to their agreement. The event upon which the transfer of title would become effective was "the dissolution, suspension, expulsion or termination of affiliation" of the local with the union. The provision is applicable, of course, not only to Local No. 1, but to any local. The object of this and related provisions of the constitution of the union was to give stability to the organization of shipyard workers in the Delaware valley, or wherever the union might extend. Members of a local would think twice before seceding or taking action that might lead to expulsion and so bring about the loss of all property of their local. This *44 object, or the means selected for accomplishing it, does not seem at all contrary to public policy.
Are the judgments of our late court of last resort in State Council, Jr. O.U.A.M. v. Enterprise Council, 75 N.J. Eq. 245 (1909), and Grand Court v. Court Cavour, 82 N.J. Eq. 89; affirmed, 83 N.J. Eq. 343 (1914), controlling? It may be noted in the first place that these cases relate to fraternal societies. Labor unions cannot well be classified with religious or fraternal organizations, and it is hazardous to assume that decisions concerning the latter settle the law as to labor unions.
As I read the opinion of Justice Swayze in State Council v. Enterprise Council, enforcement of the forfeiture clause was denied for two main reasons, neither of which applies to the instant case: First, forfeiture would strip the subordinate council of the property which it held for the purpose of carrying out the object for which it had been incorporated by the State of New Jersey and such stripping would be illegal. Second, the basis of the forfeiture was the action of the State Council itself, namely, the dissolution of the relation between it and Enterprise Council, and to give effect to such a forfeiture "would be contrary to the fundamental principle which prevents one from being a judge in his own cause." We may note that Local No. 1 in the suit before us is not a corporation, and also that the breaking of the bond between it and the general union was not the work of the latter, but was done by the local itself. In Grand Court v. Court Cavour the subordinate lodge was a corporation, the forfeiture was alleged to result from a resolution of the Grand Court dissolving Court Cavour, and the decision was rested upon the authority of the Enterprise case.
A decision which seems to me to be more nearly controlling is Fidelity, etc., Co. v. Brotherhood of Painters, 120 N.J. Eq. 346 (E. & A. 1936), an interpleader between the general union and a local whose charter had been revoked and the local expelled. Chancery, on the authority of the two cases which I have been discussing, decided in favor of the local, *45 but on appeal the forfeiture clause was given full effect and the fund was awarded to the general union. See to the same effect United Public Workers v. Fennimore, 6 N.J. Super. 589 (Ch. 1950), and a decision from another jurisdiction  an early one in this branch of the law  Brotherhood of Railroad Trainmen v. Williams, 277 S.W. 500 (Ky. 1925).
In my opinion, the judgment on the counterclaim as well as on the complaint should be reversed.