VERINDA BROWN, in Her Own Behalf and in Behalf of All Other Members or Former Members of the FATHER DIVINE PEACE MISSION, Similarly Situated, Plaintiff, *v.* FATHER DIVINE (Also Known as Major J. DIVINE, Reverend M. J. DIVINE and GEORGE BAKER), Individually and as President or Other Executive Head of the FATHER DIVINE PEACE MISSION, an Unincorporated Association, and Others, Defendants.

Supreme Court, Special Term, New York County, June 28, 1937.

*William W. Lesselbaum*, for the plaintiff.

*Arthur A. Madison*, for Father Divine and other defendants.

McCook, J. This motion for the appointment of a receiver of the rents, issues and profits of real property, and of the rents, income and profits of rooming and boarding houses and of the businesses themselves, presents an unprecedented situation.

The plaintiff, Verinda Brown, who sues on behalf of herself and all other members or former members of the Father Divine Peace Mission similarly situated, in her affidavit supporting the motion alleges that she is a colored, middle-aged, married woman with only a slight schooling, by occupation a domestic and fervently religious. She makes the following statement.

As the result of an accidental mix-up in laundry delivered to her employer's home in the spring of 1929, she became acquainted with the defendant Priscilla Paul, who invited the plaintiff to visit what she described as the " Home " of her " Father Divine " in Sayville, Long Island. The plaintiff was told that Father Divine did wonderful work for the poor; that his wealth was great, his influence widespread, and that he had many Sunday visitors " who came to share his generous dinners and listen to his spiritual messages."

The plaintiff, in the company of Priscilla Paul, subsequently visited the home in Sayville. The affidavit recites in great detail the history of the development of the relationship. There were hymns, spirituals and testimonials, and the chief topics of talk were the " spiritual powers and qualifications of Father Divine." At the dinners " the silverware, plateware, china, linen and table service were matched and uniform in style and design." The quantity, quality and variety of the food were amazing " and every one present was asked to eat as much as he desired." The menu follows: coffee, postum and hot water, chicken, ham and beef stew, corn, mashed potatoes, rice, hominy, beans, peas, sliced tomatoes, cold slaw, lettuce, spinach, ice cream, " two enormous cakes, oval-shaped and as large in diameter as automobile tires, but higher," pies and a whole cheese. Their host officiated and passed the first helping of food. The visits were repeated until the plaintiff and her husband, who had the same employer, moved into the " home," where some twenty-five persons lived, the occupants changing frequently. She found herself " tingling with excitement and religious fervor and soon visioned the halo around Father Divine, as did all the others." Before long, she says, he began to question her as to how much money she had.

Without reciting all the steps, here is a fair summary of the worldly or financial side. First, she presented a bundle made up of sheets, slips and an inexpensive suit of clothes, which were accepted by Father Divine without a word of comment. Then, after a statement by Father Divine that the only way to everlasting and eternal life was to give up everything for him, she sent a dining room suite, a bedroom suite and some other furniture. This offering met with Father Divine's approval, so a gift of three large cartons of expensive and exquisite linens, bedspreads, embroidery, etc., followed.

Plaintiff was told by Father Divine that by reason of these sacrifices she had arrived at a state of perfection according to his teachings, and he permitted her, as evidence of promotion, to adopt a " spiritual " name in keeping with such aspirations. She selected " Rebecca Grace " and her husband " Onward Universe." After this, husband and wife addressed each other by these spiritual or angelic denominations.

Further expressions of her surrender were some gold coins and $995 cash. Father Divine told her that she now merited his reward of everlasting peace and eternal life in his kingdom, accepting the money " with a warm smile," so that the plaintiff and her husband felt that they had been " good and faithful servants of the Lord." The gradual abandonment of earthly possessions culminated in June, 1930, when the plaintiff's husband, " as an angel of Father Divine," determined to dedicate his future life entirely to his service.

For some four or five years the husband lived in Father Divine's establishment. The plaintiff apparently continued her former employment, not forgetting her duties to Father Divine, which included numerous gifts of cash and now and then a visit to the " home." In October, 1934, Father Divine rebuked her for seeing her husband and giving him money, and instructed her to treat " Mr. Universe " as a total stranger; at the same time defendant Divine refused to accept further money from her. In fear of his displeasure, she purchased blue serge cloth for a suit and silk for a dress and gave them personally to Father Divine, who received them without a word of thanks. Shortly after Christmas, however, Mother Divine with great pride showed her a silk dress made out of material presented, which Father Divine had given to her.

The total value of the money and property which the plaintiff says she gave to Father Divine is computed at $4,476. She swears he told her that the banks were not secure but that money deposited in his heavenly treasure was always safe and secure; that if she

wished to become one of his blessed children she would have to make a complete sacrifice of all her worldly possessions and be willing to place everything in his heavenly treasure for safekeeping; further, that she could make his home hers for the rest of her life. She avers that she relied upon these representations in giving Father Divine the various sums of money and property, that these representations were false and known by him to be false when made, because in truth he was not gifted with divine powers and could not insure her eternal life and happiness, and did not and could not possess money in a heavenly treasure. The moneys she deposited with him were used for purposes other than the benefit of the depositor; they were neither earmarked nor kept apart, but commingled with other moneys received by him; moreover, the wants of his " angels and children " (" angels " being the highest classification of followers and " children " a level or two below) were not supplied. In October, 1934, she demanded without avail the return of her property. " Since October, 1934, Father Divine has failed and refused to provide any spiritual or other aid to me or to supply my wants or needs."

She asserts that he organized the Father Divine Peace Mission, representing that all his angels and children who lived up to his teaching shall become members of the mission and as such are entitled to share in the abundance of everything which he would supply from his heavenly treasure. Instead of storing money and property in a heavenly treasure, the greater part, she contends, was concealed and misappropriated by Father Divine and large sums were expended for the purchase of real estate in Ulster county, N. Y., for colonies. He caused title to be taken in the names of followers of his, who furnished little or no part of the purchase money, for they have no money which would enable them to purchase such real property. He has, so she contends, other business related to this mission, to which the funds of his followers, deposited for safekeeping, have been wrongfully diverted.

Such are the charges, in so far as appropriate to this motion.

In his answer to these charges the defendant Divine files a 100-page affidavit. He says: " The affidavit of the complainant Verinda Brown is false, malicious, fraudulent and untrue," and proceeds: " She declares she was convinced to believe me to be God even as the others did, and being under the frenzied influence of the Spirit naturally she was willing to do anything she thought would please Me. Yet she claims to remember the dates and all of the records as put forth in her affidavit. It would have been a matter of impossibility. No one of them making a complete

surrender as she says she did would have kept any such record." She never mentioned to him in person or by letter that she expected anything from him nor did he owe her anything; but she voluntarily and persistently insisted that he take presents from her. He quotes a letter from her to him dated March 15, 1930: "Father Dear: Your Spirit within Me is sending some flowers for Dining Room." The sending of flowers, says he, indicates that she had not previously given him furniture. His affidavit then recites offers of aid or gifts to him in the form of several letters and his replies in refusing to accept them on the ground that "My Spirit, My Activities are a free Gift to the World, Gratis to All Mankind," with the admonition, "Live in this recognition, knowing the Spirit of My Mind and the Mind of My Spirit will quicken you in the light of this Truth, bringing into display in your life the positive, the good, the pure and the true. Then, as I am, so can you and all mankind be, for I am Well, Healthy, Joyful, Peaceful, Lively, Loving, Successful, Prosperous and Happy in Spirit, Body and Mind and in every organ, muscle, sinew, vein and bone and even in every atom, fibre and cell of bodily form." This combination of words reappears frequently in his correspondence with all sorts and conditions of persons, as set out in the answering papers.

He claims he has always given his "professional service as gratis to all and refused to receive anything from anyone as a donation, remuneration or contribution for same unless I could give something material, tangible and practical for such as I might receive." The citizens of Sayville, it seems, speak highly of him and many testimonials are furnished, giving both letters and replies in full. The last year or two, he swears, these "disgruntled, malicious and dishonest and unfaithful persons have attempted to get something for nothing while they themselves — such as did work while being connected with Me and those who are concerned — have spent it lavishly and wastefully without consideration of the work that I was doing. Anyone who desired it who say they gave Me money might have remained in the Home until now, without compensation, remuneration or pay for any of the services they might have received."

In the latter part of 1933, he states, he offered, through the press, to pay the sum of $1,000 as a reward to any one who could refute his statement that "the ten million followers of mine and believers having given me their lives and all they had possessed, does not mean they gave it to me as a person. Neither have these

things come under my personal jurisdiction. When they say they have given me anything or all they have, they are not speaking of giving me anything personally, for they can tell the world at large I don't need it as a person." Excerpts from some of his messages then follow in support of his contention. He recites his virtuous teaching to pay all bills, to return stolen goods, etc. He has refused " what might be termed legitimate offers of thousands and thousands for My Personal Appearance coming from different parts of the country amounting to $10,000 and more for a single tour," and attaches copies of letters to this effect, also seventy-eight others showing the return of stolen property, the payment of old bills, etc.

The foregoing, says he, is a complete picture of the entire situation of his connection with Father Divine's Peace Mission. " As so often stated, my Mission upon Earth is that of universal peace and those who desire to cooperate or participate with Me in this great activity of universalizing peace in earth, designate their efforts under the expression ' Father Divine's Peace Mission,' meaning, however, that My Mission is peace and they are cooperating in what they consider My Mission — Father Divine's Peace Mission." His affidavit concludes with the statement that there is no association or organization, incorporated or unincorporated, called Father Divine's Peace Mission, nor are there any members; no donations, contributions, collections, dues or fees are collected by him or deposited by others and turned over to him for the Father Divine Peace Mission or for any other purpose. Neither the plaintiff nor any one else deposited any money to be kept in the heavenly treasure. The plaintiff has not given him one penny which was invested in any of the properties purchased in Ulster county (the " Promised Land ") by his followers.

· The papers on this motion contain other and voluminous affidavits in support and opposition. After the first presentation and brief argument, attended by Father Divine, the court determined to hold another hearing and take testimony, thus giving each side an opportunity to fill gaps in the evidence, and providing in the interest of truth a certain amount of confrontation. At the second hearing the defendant Divine was not present.

The plaintiff offered as her chief witness Faithful Mary, a former follower of Father Divine. She rehearsed her connection with Father Divine and the Father Divine Peace Mission, described her efforts along similar lines prior to the time she met him, and then her intimate connection with his work. She supplied a picture of the particular " heaven " conducted and managed by her, of nego-

tiations and business transactions with Father Divine, of the payment to him of $500 or more weekly. At times he complained that these payments were insufficient and sent his secretaries and checkers to investigate. The money at all times was in cash, both receipts and disbursements.

Father Divine's witnesses testified to the complete absence of membership, organization and business meetings. Each heaven or group, they said, was independent and not related to one central organization. They experienced some difficulty in explaining the purchase and registration of buses, the general management and so forth, but asserted that the money used in each particular venture was the personal property of that venturer.

Upon the affidavits and the oral testimony taken together, no doubt remains in the mind of the court that the plaintiff gave, donated or presented to Father Divine, or that he accepted, the property which she specifies. Nowhere in his long and wordy affidavit is found a flat, direct denial of this fact. Stripped of verbosity, it amounts to a denial by him " as a person " of the receipt of anything from anybody. Since this court operates in the realm of a material universe and its jurisdiction does not extend to the spiritual sphere, I must hold that when the individual Rev. Major J. Divine, generally known as Father Divine, speaks, he speaks in his human form and capacity, as a person no different from any other earthly being. He sleeps, eats, drives a car and receives and pays cash. Whether he inspires faith and transcendent belief does not concern the court, except as a factor in explanation of what has occurred. It is said that this movement has accomplished wonders of faith and morals among its followers — that even, as stated by one affiant, the food on the table seemed to multiply. Of such phenomena, however, this court cannot take more particular notice, but must attempt to ascertain the material facts, so as to preserve all legal rights pending trial.

Defendant Divine unquestionably has some kind of organization or association which is not beyond the bounds of the law, and should not be beyond its reach. When numbers of persons congregate at stated times and specified places, that occurrence is not attributable to miracle, chance or accident. A busload of followers transported from a definite spot in New York to some " heaven " or haven is a reality, whether under the ægis of Father Divine or Father Divine's Peace Mission. Disregarding nomenclature and circumlocution, the common purpose and unity of the persons composing the movement or association are not altered by any denial of membership, association, dues or contributions.

Father Divine was the accepted leader of the group. As a person he received, counted and paid out money. He was the presiding director of its collection and use. He participated in the purchase of property in Ulster county, in the names of followers, actively supervised his business and his business organization, and managed them in many if not all respects. His lieutenants, defendants Lamb, Calloway and Madison, by their conduct in court and their expressions by affidavit, give forceful if unconscious support to the claim set forth by the plaintiff. Their denials and attempts at explanation are unconvincing. The evasions in the affidavits are not cured by the testimony.

The organization known as Father Divine's Peace Mission is neither a corporation nor a partnership; it is, however, an association analogous to what is known to the law as a voluntary association.

The spiritual principles of the mission and its peace mission neither conceal its nature nor make it less amenable to law. It is accountable for its acts and may not violate or evade the law. It is, therefore, as an association, a proper defendant. Defendant Divine was served both as an individual and as president of an unincorporated association with all the necessary papers. Moreover, at the hearing on May 12, 1937, any special appearance by the defendants Divine and Madison was withdrawn and they proceeded on the merits, with Madison representing both.

I have already expressed a finding that the plaintiff in this case made substantial payments to Father Divine. Many others contributed substantial sums to him and his mission. These were not gifts, since in each case is found a promise to hold money or property in the heavenly treasure, a representation that banks are unsafe, and an undertaking to return upon demand. In addition, defendant Divine promised to support and maintain the giver in a heaven for life. He has offered in evidence testimonial upon testimonial to the effect that he refused to accept personal gifts of any nature. His receipt of anything which he took was, therefore, in legal effect, as representative of a movement or mission and constituted acceptance of a presentation to an association of some sort. It is referred to as a co-operative venture, a species of community which owns all the property of its members and apparently guides their spirit. Instead of organizing an entity readily recognized and subject to proper claims, the defendant Divine saw fit to create a " mission " whose property was held by individual followers. I conclude that these did not purchase the holdings with their own funds, and in some cases probably knew nothing about their ownership.

In other words, the fraudulent dealings with which defendant Divine is charged consisted not only in taking money, by misrepresentation, from some individuals, but also in using others as his instruments to hold property purchased with such money. For this reason, among others, the complaint seeks to impress a trust.

Again we must distinguish between the spiritual tenets of the mission and its material, physical situation. The fact that one who holds property is a follower of Father Divine in no way affects his legal title to that property. Since these holders can at any time by transfer divest themselves of their ownership and thus render any recovery by the plaintiff or others similarly situated futile, some provisional relief must be found. Where unvindicated rights are seen, society will not concede helplessness to protect the possessors of those rights.

In normal circumstances a receiver would be appointed to take possession and institute action. The strange facts in this case make such a course inadvisable, save as a last resort, for the court is reluctant to disturb in any part or respect the spiritual work of a religious group. The parties are directed to settle an order providing in the alternative (1) for a sufficient and adequate bond, in cash or executed by a surety company, and to be approved by a justice of this court; (2) for the retention of all personal and real properties *in statu quo* through the service of a proper and effective injunctive order upon all persons who are the record holders of such property; (3) for the appointment of a receiver or receivers. Defendants may, if they desire, add provision for preference of a trial of the action upon the merits.

The motion is granted to the extent indicated. The stay directed in open court and consented to by counsel for the defendants, also in open court, is meantime continued.