26 N.J. Super. 333 (1953)
97 A.2d 761
JOHN HARRISON, ET ALS., PLAINTIFFS,
v.
JOHN FLOYD, ET ALS., DEFENDANTS. OVEAN BISHOP, ET ALS., PLAINTIFFS,
v.
GALILEE BAPTIST CHURCH, A RELIGIOUS SOCIETY OR CORPORATION OF THE STATE OF NEW JERSEY, ET ALS., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided June 8, 1953.
*336 Mr. Clifford R. Moore, attorney for John Harrison, et als.
Mr. Frank H. Wimberley, attorney for John Floyd, et als.
Mr. Robert Queen, attorney for Ovean Bishop, et als.
*337 GOLDMANN, J.S.C.
Galilee Baptist Church finds itself caught in a cross-fire of litigation because its pastor, officers and members, professing a common faith and pledged to the bond of Christian fellowship, are in conflict. The dispute centers upon Reverend Samuel M. Bagley, the pastor, and has divided the church into three camps: pro-Bagleyites, anti-Bagleyites, and a large group of members who take neither side but want to save the church from the corroding and destructive force of the controversy.
Galilee Baptist Church is an incorporated religious society of the State of New Jersey, established in 1920, and located in Trenton. It has no constitution or by-laws of its own; instead, it has relied upon custom and the writings of Hiscox, author of the standard guides for Baptist churches. There was a good deal of testimony relating to Hiscox' New Directory for Baptist Churches (1945 ed.), which was marked for identification but not offered in evidence, and to his New Manual for Baptist Churches (1931 ed.), a popular abbreviated version of the New Directory, which was marked in evidence. Both guides seem to have been used by members from the very beginnings of the church. However, there is no written record as to just when either was adopted, if ever. The court may properly note what so established an authority as Hiscox has to say, and refer to his New Directory as a standard reference work.
Each Baptist church is a self-governing body, independent of all other churches. Randolph v. Mt. Zion Baptist Church of Newark, 139 N.J. Eq. 605, 609 (Ch. 1947). Its affairs are administered by the membership acting together, and the will of the church is expressed by a majority vote of the members. Hiscox, New Directory, p. 144, and Manual, p. 13.
The Baptist church recognizes only two church offices: pastors and deacons. The spiritual welfare of the congregation is, of course, the pastor's special charge. Although he has the general oversight and superintendence of all departments of church work, both spiritual and temporal, Hiscox enjoins that the pastor should not needlessly interfere *338 with the deacons or trustees, "nor assume dictatorial authority over others in their service"; rather, in the administration of church affairs "he should secure the cooperation of his members, but gain his object by reason and persuasion, rather than attempt to force compliance by authoritative dictation." New Directory, pp. 97, 101. Almost universally a church engages its pastor for an indefinite term; his relation with the congregation may be dissolved at the option of either party by the giving of three months' notice, or otherwise by mutual agreement. Hiscox, New Directory, p. 108 and Manual, p. 16. This, as we shall see, is the arrangement at Galilee.
Baptist churches hold that a deacon is "a minister of temporalities, and a helper to the pastor in his ministry of the Word." Deacons "act as counsellors and assistants to the pastor in advancing the general interests of the body, both temporal and spiritual." They are commonly chosen for an indefinite period (Hiscox, New Directory, pp. 109-112, and Manual, pp. 14-16), and such is their term at Galilee.
Although traditionally the secular concerns of a Baptist church, including its financial affairs, would seem legitimately to be included in the duties of deacons, since such matters come under the head of temporalities, they are presently usually committed to trustees elected in accordance with state law. Hiscox, New Directory, pp. 115-116, and Manual, p. 16. R.S. 16:2-9 provides for the election of trustees who, in the absence of any resolution of the church as to their terms  and there is none in the case of Galilee  "hold office for one year from the date of their election and until their successors are chosen." The practice of Galilee has been to elect trustees at the annual meeting held toward the close of the year, and they have had the care and custody of the church property and the management of its finances.
In Baptist churches the pastor is, by virtue of his office, moderator of all "church business meetings, but not of society business meetings [e.g., annual meetings], which meetings are held according to statute law, for the election of trustees and for other matters pertaining to temporalities. These *339 meetings, even though composed of the same individuals, yet are not the same official bodies. The moderator is elected on nomination. The pastor is eligible to election * * * but cannot assume the chair by right of his office." Hiscox, New Directory, p. 191. Business meetings, both regular and special, should be announced from the pulpit at least one Sunday before they are held. Special meetings may be called at any time "by consent of the pastor and deacons, or by such other methods as the church itself may direct." Hiscox, Manual, p. 42, notes 2 and 3.
Reverend Bagley became the spiritual leader of Galilee Baptist Church in 1935. The church was then in debt, its total income was less than $3,000, and there were only some 400 members on roll. It could not afford to pay its pastor a salary. There was a gradual increase in both membership and income in the years that followed. The mortgage indebtedness was paid off and major repairs made, including the installation of a new electric organ and a heating system. The pastor was put on salary about 1938; it was increased until fixed at $50 a week in 1946.
During the year 1942 difficulties arose between Reverend Bagley and members of the deacon board. This resulted in a church meeting, held May 1, 1942, when it was voted that "the pastor remain as is as long as he and the church can agree," and in case of disagreement either the pastor or the church was to give the other three months' notice of the termination of the relation. The minutes record that Reverend Bagley "was duly elected indefinitely as pastor," and that he and the officers agreed to work with each other.
Harmony reigned until the spring of 1950 when a young unmarried parishioner accused the pastor of being the putative father of her unborn child. A church trial was held May 6, 1950, presided over by Reverend Woodson, pastor of another Trenton Baptist church, whom the congregation had requested to act as moderator. The membership heard the testimony of the accusor and her witnesses, as well as Reverend Bagley and his witnesses. Those present, including the deacons and trustees, agreed to abide by the decision of *340 the majority. The meeting found the accused pastor not guilty by a vote of 171 to 95.
Subsequently, Reverend Woodson called a council of ministers at the request of the pastor and officers of Galilee, to consider the differences which divided them. See Hiscox, New Directory, c. VIII, passim, as to church councils. The council, whose function was merely advisory, recommended that the parties get together and make their peace. But the breach would not heal; the morals charge brought against the pastor had cut deep into the fibre of the church. Tension was particularly evident in the relations between the pastor and the deacon board.
Matters reached a head at the church meeting of August 31, 1950 when a motion was made that Reverend Bagley be dismissed because of the bastardy charge brought against him. The pastor, presiding as moderator, ruled the motion out of order. Confusion and disorder followed, and the pastor walked out of the meeting, followed by some of his supporters. There was testimony that he did so after a motion to adjourn. However, there is strong evidence that no such motion was made or put to a vote. The minutes kept by John C. Glover, then church clerk and supporter of the pastor, show extensive erasure and a rewriting at this point of the meeting record. After Reverend Bagley's departure the meeting continued, elected a temporary chairman and clerk, and passed the motion dismissing the pastor with three months' pay.
On September 20, 1950 proceedings were instituted against the pastor in the case of Galilee Baptist Church v. Bagley (Docket C-121-50). The complaint recited the action taken on August 31, the notice of dismissal sent to the pastor, his refusal to obey it, and his persistence in carrying on his duties, to the detriment of religious services and the church generally. Judgment was demanded restraining Bagley from carrying out or attempting to carry out his duties as pastor, from presiding at meetings of the congregation, board of trustees or board of deacons, and directing him to turn over all records and papers in his possession. The complaint *341 was certified by John Floyd, chairman of the deacon board and a defendant in the present litigation, and Abraham English, chairman of the trustee board, now deceased. It is clear that associated with them in the action brought in the name of the church were the present defendants in Harrison v. Floyd. It is equally clear that the litigation was without prior authority sought and obtained from the church body.
The reaction of Reverend Bagley was immediate. Without consulting the deacon board he called a special meeting on September 22, 1950 and complained to the members assembled of the suit that had been brought against him. He charged Deacons Floyd, Dawsey, Dyous, Joyner, Miller, Thomas Glover and Thomas (seven of the nine members of the deacon board), and Trustees English, McKeever, Scott and Williams with dismissing him, engaging an attorney, bringing him to court, and withholding salary, all without church consent, and asked that they be dismissed from office and silenced for 12 months. This was done by an overwhelming vote. The meeting authorized the hiring of an attorney to defend the pastor or the church, and also appointed one Roosevelt Walker as chairman of the trustee board in place of English, and one Maynard Stephens as treasurer in place of Thomas Glover. No regular church meeting was held until January 4, 1951, at which time the membership rejected the minutes of the September 22 meeting and reinstated the discharged officers. During this troubled interval between meetings the church treasury declined from $4,023 to $1,636; $1,885 of the difference allegedly was spent for a new heating system.
In the meantime, a bastardy complaint had been filed against Reverend Bagley in the Municipal Court of the City of Trenton. He was acquitted of that charge on December 11, 1950.
The action in Galilee Baptist Church v. Bagley was dismissed, the order bearing date March 29, 1951. The parties had agreed that a church meeting be held on that date to consider the tendered resignation of the pastor, the parties to abide by the vote of the majority. Such a meeting was *342 held and was presided over by a court-appointed representative, assisted by a local minister as moderator. It rejected the resignation by a vote of 213 to 193 (or 188). In ordering the Galilee action dismissed the court directed that the church pay the pastor's salary up to and including March 29, 1951. The sum of $450, representing nine weeks' salary, was subsequently paid to Reverend Bagley.
The complaint in Harrison v. Floyd was filed May 22, 1951 by Deacon John Harrison and Reverend Bagley. Harrison sued on behalf of himself as a member of Galilee and other members similarly situated; the reverend sued as pastor of Galilee and by virtue of having a property right in his position. The first count, brought by Harrison, recites that despite the vote of March 29, 1951 and the order of dismissal, the disgruntled defendants had harassed the pastor and the entire membership, caused disorder at meetings, not permitted the church to operate smoothly, and refused to allow the pastor to exercise his duties. It is alleged that membership and collections have fallen off, and that this would continue unless order was restored at once. Harrison demands judgment restraining defendants and others similarly situated from interfering with the business and religious functions of Galilee or otherwise causing damage, harm or interference to the pastor.
In the second count, brought by Reverend Bagley, he repeats the allegations of the first count and states he cannot conduct church affairs because of the interference of defendants and others similarly situated. He further alleges that Thomas Glover, the treasurer, has upon the illegal order of Floyd, chairman of the deacon board, withheld and refused to pay his salary and that he has not been paid since March 29, 1951. The pastor demands judgment restraining defendants and others similarly situated from interfering with the business and religious functions of Galilee or otherwise doing harm or injury to or interfering with him as pastor; ordering the treasurer to pay the salary due him from March 29, and restraining the treasurer from withholding payment of $200 a month so long as Bagley performs his duties as *343 pastor. The complaint is supported by the affidavits of Deacons Harrison and Knighten, Trustee Jenkins, the president of the Young Peoples Club of Galilee, and eight other members, all supporters of the pastor.
Jurisdiction is not challenged. See Livingston v. Rector, Etc., of Trinity Church, 45 N.J.L. 230, 233 (Sup. Ct. 1883); Jennings v. Scarborough, 56 N.J.L. 401, 410 (Sup. Ct. 1894). Cf. Skinner v. Holmes, 133 N.J. Eq. 593 (Ch. 1943); N.J. Annual Conference, Etc., v. Lattimore, 6 N.J. Super. 348 (App. Div. 1950).
An order to show cause with interim restraint was entered in Harrison v. Floyd on May 22, 1951 and a consent order of temporary restraint allowed June 1, 1951, defendants  seven deacons and seven other members  having filed answering affidavits in the meantime.
Defendants' answer denies that they had harassed, annoyed or interfered with the functioning of the church or the pastor, or that any salary was due Reverend Bagley. As to the latter, they allege that it is for the membership to determine the pastor's salary, and that there had been no meeting to fix the salary for 1951 because of the pastor's refusal to call one. By way of counterclaim defendants allege that the pastor no longer serves the best interests of the church; that he was in constant disagreement with the deacon and trustee boards, refused to work with them and usurped their functions and duties; that as moderator at business meetings he catered to his followers and would not follow Hiscox as a guide, refusing to recognize proper motions, adjourning meetings when motions were pending, and refusing to yield the chair when he was personally involved. The counterclaim sets out various disturbances in the church; recites the details of the bastardy charge, the action of the August 31, 1950 meeting and the proceedings of the special meeting called by the pastor on September 17, 1950; and charges that the pastor is unable to keep order, that he accepts money over the pulpit on Sundays, contrary to the rules and practice of Galilee, and that he has failed to account for funds so received. The counterclaim demands judgment for an *344 accounting by the pastor of all monies received from the treasurer, excluding salary, from September 17, 1950 to January 4, 1951, and of all monies received over the pulpit or on the church premises since March 29, 1951; restraining him from carrying out his duties as pastor or attempting to do so, representing himself as pastor of Galilee, or presiding at meetings of the congregation or deacon or trustee boards; and directing that he turn over all property, records, papers or monies in his possession or control. The counterclaim is verified by the individual affidavits of all the defendants.
Plaintiffs deny all material allegations of the counterclaim and set up three separate defenses: (1) the allegations of the counterclaim are res adjudicata by virtue of the judgment of dismissal in Galilee Baptist Church v. Bagley; (2) the monies received by the pastor since March 29, 1951 have been gifts, and not monies due any church official; and (2) "unclean hands," defendants having failed to abide by the judgment in the Galilee Baptist Church case.
Plaintiffs then instituted contempt proceedings for defendants' alleged violation of the restraining order of June 1, 1951. These proceedings were dismissed in October 1951, the consent order reciting that plaintiffs would forego bringing contempt proceedings for anything that occurred before October 1, 1951, and that a certified court reporter would thereafter appear at all church meetings to record the proceedings.
Meanwhile, on September 21, 1951 Ovean Bishop and 91 other members of Galilee Baptist Church, for themselves and all others who might be willing to join with them, instituted an action against the church, Reverend Bagley, Lionel Leary, church clerk, Thomas Glover, treasurer and acting chairman of the trustee board, and John Harrison, deacon. The complaint was subsequently amended to add as parties defendant the five "holdover" trustees of the church and the eight remaining deacons. (Of these eight, all but Knighten are parties defendant in Harrison v. Floyd.) The Bishop complaint alleges, among other things, that there are constant disorders in the church and it is operating without a trustee *345 board; that the restraining order in Harrison v. Floyd has been disregarded; that business meetings of the church have broken up in disorder, citing instances; that peace officers have had to be called in to keep order; and that it is unsafe to attend the church. Judgment is demanded for: (a) an accounting by defendants; (b) that they be restrained from exercising any of their official duties or from collecting contributions or paying out, assigning or transferring any church property, (c) that the church be declared defunct because conducted at a great loss, prejudicial to the interests of the plaintiffs and other members, and because its business is suspended through inability or failure to elect and install trustees and officers, and (d) appointment of a receiver.
The only answering defendants are Reverend Bagley, Deacons Harrison and Knighten, and two of the "holdover" trustees, Glover and Jenkins. They allege that it was plaintiffs' conduct which led to the institution of Harrison v. Floyd, that defendants have obeyed the temporary restraint, and that there has been disorder at meetings but plaintiffs participated therein. Three separate defenses are set up in the answer: (1) plaintiffs failed to demand relief from the church before instituting their action, (2) "unclean hands," in that plaintiffs participated in the disorders and were responsible for the difficulties, and (3) (but not by way of defense) joining in the demand for an accounting. The other defendants were defaulted.
The cases of Harrison v. Floyd and Bishop v. Galilee Baptist Church were consolidated by order entered December 11, 1951, which directed that there be no further business meetings at the church until after adjudication.
As was to be expected, the testimony in the Harrison action relating to the charges that defendants interfered with the business and religious functions of the church and were doing harm to and interfering with Reverend Bagley, is in sharp conflict. Most of the testimony of the pastor and his witnesses, particularly John C. Glover, former church clerk, and Deacon John Harrison, centered upon defendants Floyd, Thomas Glover, Joyner and Dyous, all deacons. They testified, *346 among other things, that various of the defendants called the pastor uncomplimentary names, challenged his authority, made slighting remarks about his sermons, conducted themselves in a disorderly fashion at meetings and blocked effective action, and demanded that the pastor resign. Much of this testimony related to events that occurred after the restraining order of June 1, 1951, but was permitted in order to obtain as complete a picture of the Galilee situation as possible.
The defendants so charged took the stand and flatly denied that they or any of the defendants had annoyed or harassed Reverend Bagley or interfered with the business and religious functions of the church. They were subjected to vigorous cross-examination as well as to questions put by the court.
In the many days of hearing, I took particular note of the character and demeanor of the witnesses and their manner of testifying. Most of the defendants have been connected with the church for many years, and some helped found it. Those who are deacons have assisted in the church for long periods. They are unquestionably sincere and concerned with the welfare of Galilee. They apparently have tried to get Reverend Bagley to cooperate with them as his spiritual assistants, but he has consistently refused to consult and advise with the deacon board since the meeting of January 4, 1951 when the dismissed deacons were reinstated.
Practically every charge made against them is denied by defendants. It is admitted that no salary has been paid the pastor; the reason for this is that there has been no annual meeting to fix such salary, nor has it been possible to hold one. In view of that fact the deacons have tried, with such help as they could get from the holdover trustees, to keep Galilee going. This was apparently in keeping with the Baptist tradition that besides helping the pastor, deacons may attend to such temporal affairs as require attention. Hiscox, New Directory, pp. 110-111, 115 (note 7), and Manual, pp. 14, 16 (note 8).
After carefully reviewing all the testimony, I conclude that a permanent injunction should not issue in Harrison *347 v. Floyd. The remedy of injunction is an extraordinary one and may not be awarded to any suitor unless and until his right to it is established by clear and convincing testimony, free of all reasonable doubt. If plaintiff's asserted right is doubtful or disputed, equity will move cautiously before determining to grant him a remedy by injunction. The burden of establishing the right to an injunction is upon him who asserts it. Plaintiff may not leave his proofs in such shape that a reasonable doubt remains for, as has so often been said, to doubt is to deny. Van Name v. Federal Deposit Insurance Corp., 130 N.J. Eq. 433, 444 (Ch. 1941), affirmed 132 N.J. Eq. 302 (E. & A. 1942); State v. Jennings, 131 N.J. Eq. 511, 512 (E. & A. 1942); 28 Am. Jur., Injunctions, § 24, p. 217.
One who seeks injunctive relief must show himself free from all just imputation of wrongdoing in connection with the acts which are the subject matter of his application. Van Name v. Federal Deposit Insurance Corp., above, at p. 445. I am persuaded that Reverend Bagley is personally not without fault in the circumstances. He called the special meeting of September 22, 1950 without consulting with his deacons, and got that meeting to dismiss the majority of his deacons and trustees. He has refused or neglected to meet or consult with the deacon board. As moderator presiding at business meetings of the church he has neglected or refused to conduct the meetings in accordance with the rules of order generally accepted as governing Baptist meetings and which are set forth in Hiscox, Manual, pp. 43 et seq., the guide the pastor professes to follow, and in the New Directory, pp. 576 et seq. He has ruled out of order, whether unintentionally or otherwise, motions which were properly presented; refused to recognize members asking for the floor; limited debate without the body first having voted limitation; refused to entertain motions to adjourn  a motion which is always in order except while a member is speaking or when taking a vote  because, as he maintained, there was a member standing; and generally, through ineptness or otherwise, so failed in discharging his duties as moderator that meetings invariably *348 ended in confusion and disorder. In all this he had the support of his followers, among them plaintiff Harrison.
There is another and equally important reason why the injunction here under consideration should not be granted. The charges made against defendants in the complaint and in the course of the testimony are considered "public offenses" under Baptist church discipline, constituting, in the words of Hiscox, "a violation of covenant faith or duty," and "an injury to the cause of piety," in which "the whole body is equally concerned and equally responsible." New Directory, p. 180, and see Manual, p. 31. Such "public offenses" include disregard of authority ("When a member refuses to submit to the requirements of the Church"), and contention and strife ("Where a member is factious, foments discords, stirs up strife and becomes a leader of party, disturbing or destroying the peace and harmony of the body"). They also include immoral conduct, arrogant deportment ("When a member, in a spirit of arrogance and pride, assumes authority, and affects superiority, undertaking to domineer and rule the Church"), and going to law ("the prosecution of fellow-members at civil tribunals, instead of private and peaceable arbitration `before the saints'"). New Directory, pp. 181-184 and Manual, pp. 31-32. Baptist practice calls for bringing public offenses before the church, that it may direct a proper course of discipline. Charges, notice and a full hearing are required. New Directory, pp. 185-192, and Manual, pp. 33-35 (particularly note 5). Public offenses must, therefore, first be tried before the church. Admittedly, no charge was ever brought by Reverend Bagley or any of his supporters against any of the defendants.
The pastor claims that no purpose would have been served in bringing such charges before the church body, in view of the disorder attending meetings. In the same breath he claims that the majority has always been with him and that he has managed to preserve a certain degree of control despite the confusion at meetings. I am not convinced that it would have been fruitless to bring written charges against any or all of the defendants and to call for a full hearing. This *349 would have been the orderly and the proper procedure. It is not for the plaintiffs to say that to follow the established practice would have been futile  at least, not until the procedure had been invoked and actually tested before the membership.
Plaintiffs have not pursued and exhausted the remedy available within the church. They may not at this stage come into court and demand an injunction.
Reverend Bagley must, however, prevail on his demand that he be paid any salary owing him since March 29, 1951 and that the treasurer be restrained from withholding payment of $200 a month salary as long as he performs his duties as pastor. We have, first, the vote of May 1, 1942 electing Reverend Bagley "indefinitely as pastor," and that he remain "as long as he and the church can agree," and should there be disagreement, either he or the church body could give three months' notice of termination of his Galilee ministry. Such notice of termination has never been given since the meeting of August 31, 1950. However, the action of that meeting was effectively vitiated by the vote of the church body taken on March 29, 1951 under direction of the court. That vote rejected the pastor's proffered resignation and therefore clearly continued him in his office at the salary of $50 a week previously fixed by the church.
That salary remained unchanged until a meeting held on November 29, 1951. The preceding regular business meeting of the church, held on November 1, 1951, ended in disorder and without any business being transacted. Five of the deacons had brought up under the head of a privileged question  which under the rules of order governing Baptist churches takes precedence over all other business and precedes all other motions except that of adjournment  their grievance against the pastor because he had instituted an action "contrary to the rules of the church." Hours of dispute followed as to whether the minutes of the last meeting should first be read, or the privileged question disposed of. Part of the long and confusing argument was over the propriety of the pastor presiding when he personally was involved, *350 the church clerk citing Hiscox' New Directory, p. 191, note 21, which states that he should not do so, but resign the chair and allow the meeting to elect someone else. After the meeting adjourned, the Reverend Bagley announced that there would be no further meetings because of the disorder that had attended successive gatherings. The church, however, did not formally approve of his announcement.
In light of the overriding principle that a Baptist church is an autonomous body, whose affairs are governed by the will of the majority, it is at least questionable whether Reverend Bagley had any authority to make the announcement he did and to foreclose further meetings. Hiscox, in his New Directory, pp. 144-145, says:
"The government is administered by the body acting together, where no one possesses a preeminence, but all enjoy an equality of rights; and in deciding matters of opinion, the majority bears rule. The pastor exercises only such control over the body as his official and personal influence may allow, as their teacher and leader and the expounder of the great Lawgiver's enactments. His influence is paramount, but not his authority. In the decision of questions he has but his single vote. His rule is in the moral force of his counsels, his instruction and guidance in matters of truth and duty, and also in wisely directing the assemblies whether for worship or business. Much less have the deacons any authoritative or dictatorial control over Church affairs. Matters of administration are submitted to the body and by them decided."
The meeting of the church membership on November 29, 1951 was held without the pastor in attendance and elected its own chairman. The business of the meeting proceeded after the church clerk had read the quoted language from the New Directory. Those present then adopted a resolution which recited that the pastor be suspended from his ministerial office because of "indiscretions which caused reproach and hindered his usefulness"; that the right hand of fellowship be withdrawn from him at once as a minister of the gospel and as a member of the church because of immoral conduct, stirring up strife, being arrogant and domineering, and prosecuting brethren before a civil court without first bringing them before the church. These reasons are stated *351 as charges. It will be noted that the resolution did not accord with the formal agreement made in 1942, that the minister be dismissed on three months' notice. As for the charges, they were of the quality of "public offenses" requiring written charges, notice and full hearing, as hereinabove set forth. This church disciplinary procedure is equally applicable to pastors, deacons, officers and members of all Baptist churches. Hiscox, New Directory, p. 190, note 16.
Accordingly, the action of the November 29, 1951 meeting will be held not to have terminated the pastor's service, and this for the additional reason that the very question of the right of Reverend Bagley to continue as pastor of Galilee had been submitted to the court for adjudication under the counterclaim filed in Harrison v. Floyd and the complaint in Bishop v. Galilee Baptist Church. The judgment will provide that Reverend Bagley is to be paid any salary owing him since March 29, 1951 and that the treasurer be restrained from withholding payment of $50 a week salary as long as he performs his pastoral duties. That sum was fixed by the congregation. It has not been demonstrated that the salary has ever been changed by church action that may be considered proper.
Turning, now, to the counterclaim in Harrison v. Floyd, equity requires that Reverend Bagley account for all monies (exclusive of regular salary) that he may have received from the acting treasurer, Maynard Stephens, during the period from September 22, 1950, when the regular treasurer, Thomas Glover, was wrongfully dismissed from office, until he was reinstated on January 4, 1951. There was no congregational meeting in the meantime, so that if church funds were paid the pastor for other than salary, they were paid without authority. There is little in the proofs to show that any such moneys were in fact paid Reverend Bagley, except that counterclaimants point to the relatively large, and to them unexplained, drop in the treasury from $4,023 to $1,636 while they were out of office. If unauthorized payments to the pastor make up any part of this difference, they should be accounted for.
*352 A more difficult question is presented by the demand that the pastor account for all monies received over the pulpit or while on the premises of Galilee Baptist Church since March 29, 1951. The testimony was that friendly members have been handing money to Reverend Bagley in the course of shaking his hand after services  donations referred to as "shakehand money." The claim is that this practice first began in May 1951, when the pastor was no longer being paid a salary. Witnesses for the plaintiffs testified to the contrary, stating that pulpit gifts were a custom of long standing. Such payments may have been made from time to time in the past, but "shakehand money" became a noticeably common, widespread and continuing practice after March 1951.
Money so handed the pastor was essentially a gift made by sympathizers. It did not pass into the collection plate, and so never became part of the funds of the church, subject to disbursement by its duly constituted officers. The pastor cannot, therefore, be compelled to account for "shakehand money" received. Compare, Hiscox, New Directory, p. 105. It should, however, be noted that church collections have diminished since the differences in Galilee arose. Part of the diminution is undoubtedly due to payments made direct to the pastor by his supporters. The collection plate suffered in proportion as the pulpit benefited. One may only hope that the pastor will, in good conscience, offer to credit what he estimates (or perhaps actually knows) he received over the pulpit since March 1951, against the unpaid salary due him, thereby reducing the financial burden of his church.
There is also the circumstance of the side-table set up in the church by one of the two deacons friendly to the pastor. There he received contributions to pay for fuel for the pastor's home, realizing that the congregation was no longer appropriating funds for that purpose, as it had on occasion in the past. The deacon made church announcements of the amounts so donated on some three occasions; they totalled $180. The pastor need not account for this fuel money. The donations were purely voluntary  gifts *353 that partially relieved the church of the obligation it had assumed in less troubled days.
Counterclaimants' application for an injunction restraining Reverend Bagley from carrying out his pastoral duties or attempting to do so, representing himself as pastor of Galilee, or presiding at business meetings of the congregation, deacon board or trustee board, and directing that he turn over all property, records, papers or moneys in his possession or control, will be denied. What counterclaimants are in effect trying to do is have the court declare that Reverend Bagley is not pastor of Galilee. They are the same persons who initiated the Galilee Baptist Church v. Bagley litigation  an action which sought exactly the same restraint. They are bound by the judgment of dismissal in the Galilee case, and this on the plainest grounds of res judicata.
If counterclaimants no longer consider Reverend Bagley fit to be their pastor, their recourse is to present their views in an orderly fashion to a properly called meeting of the entire membership. The church body will, by a majority vote, determine whether it still wants Reverend Bagley as its pastor, and if not, that the relation of congregation and minister is at an end, in which case the required three months' notice should be given him. Counterclaimants can also proceed in strict accordance with the disciplinary procedure set out in Hiscox, New Directory, pp. 180 et seq., and Manual, pp. 31 et seq., calling for written charges, notice, full hearing and a vote of the membership.
Although the sweeping restraint sought by counterclaimants is denied, Reverend Bagley should not call, conduct or preside at meetings of the congregation, deacon board or trustee board in any manner other than is required by the accepted practice of the Baptist Church. Hiscox' New Directory, long established as the ecclesiastical authority among Baptists, shall be the guide. Particularly, the pastor should not preside at meetings where he may himself be personally involved in the matter or problem under discussion. Nor should he preside over meetings held pursuant *354 to statute for the election of trustees or for other matters pertaining to temporalities, unless nominated and elected by the church body to serve as chairman. Op cit., p. 191, notes 21 and 22. The judgment should so provide.
The pastor should, of course, at all times be ready and willing to consult, advise and cooperate with the deacon and trustee boards, and they with him. Much of the discord in this case stems from failure to follow this salutary and necessary practice.
There remains for determination the issues in Bishop v. Galilee Baptist Church, instituted by a large group of the membership. Despite the defense of "unclean hands" set up by the answering defendants  namely, that plaintiffs participated in the disorders and are responsible for the difficulties at the church  the proofs fail to implicate them. They are mentioned only in the testimony of Reverend Bagley, and what he had to say was not helpful; some had not been in regular attendance at church, others had apparently not talked to the point in meetings, one had in fact spoken up for church solidarity, and as for some 21 of the group, the pastor did not personally know them.
The Bishop plaintiffs claim they are neutrals caught between two unfriendly camps. Nonetheless, they take the radical step of asking the court to restrain the defendant pastor, deacons and trustees from discharging their respective duties, and demand the appointment of a receiver. In effect, they ask the Chancery Division to declare Galilee defunct, wind up its affairs and turn the key in the church door. This the court will not do.
That attendance and collections at Galilee have fallen off cannot be denied. Equally true is the representation that meetings have broken up in confusion and disorder; the minutes themselves testify to the fact. New trustees have not been elected since 1950  there were some half-dozen unsuccessful attempts to do so  but it does not follow, as plaintiffs claim, that the church is without trustees. It has been pointed out that the statute (R.S. 16:2-9) expressly provides that trustees shall hold office until their successors *355 are chosen. The defendant trustees are exactly what the amended complaint in the Bishop case designates them to be  "holdover trustees."
A receiver may be appointed for a religious society in a proper case, but courts are extremely reluctant to do so, except as a last resort. Cf. 76 C.J.S., Religious Societies, § 117, p. 900; Brown v. Father Divine, 163 Misc. 796, 298 N.Y.S. 642, 651 (Sup. Ct. 1937), affirmed 254 App. Div. 671, 4 N.Y.S.2d 989 (App. Div. 1938). Counsel cites no New Jersey case, or in fact any case, where a receiver has been appointed under circumstances such as obtain here.
When a receiver is appointed, it is usually in a case where insolvency or fraud is involved. Church schism presents an entirely different context and problem. In Grupe v. Rudisill, 101 N.J. Eq. 145, 166 (Ch. 1927), the court appointed a master who was to hold an election for church trustees, the property to be disposed of in accordance with the election result.
The situation at Galilee Baptist Church is not so desperate as to be beyond all hope of repair. Although some members have transferred to other churches, a considerable number remain. Attendance at services has improved during the course of this litigation. Sunday worship, prayer meetings and other activities continue. The various church groups  youth, women, choir  carry on their programs. The church property remains unimpaired. There is sufficient income to pay current bills and salaries other than the pastor's, and the church has a modest balance in the bank. There is no compelling reason to resort to the extraordinary relief of appointing a receiver.
The court having assumed jurisdiction and heard every aspect of the dispute, it will act to accomplish what all parties seem to seek  order, concord and renewed growth in Galilee Baptist Church. A master will be appointed, who will be advised and assisted by two Baptist ministers from the Trenton area to be named by the court, to do the following:
(1) Obtain an accounting of all church funds received and disbursed by Roosevelt Walker and Maynard Stephens, respectively *356 elected chairman of the trustee board and church treasurer at the special meeting of September 22, 1950, for the period of their incumbency, September 22, 1950 to January 4, 1951.
(2) Obtain an accounting of all church funds received and disbursed by Thomas Glover, treasurer and acting chairman of the board of trustees, or by any of the defendant deacons and "holdover" trustees named in the Bishop case, from January 4, 1951 to date.
(3) Proceed in accordance with statute and consistent church practice to call and conduct a meeting of all recognized members of the church for the purpose of electing a board of trustees for the remainder of the year 1953.
(4) Proceed in accordance with the established practice of the Baptist Church to call and conduct a meeting of all recognized members of the church to consider and take action upon: (a) continuing the present deacons in office or replacing any or all of them; (b) retaining Reverend Bagley as pastor and fixing his salary, or terminating his ministry at Galilee and giving him the required three months' notice and salary.
(5) After concluding (3) and (4), to advise and assist the duly elected officers of Galilee in adopting a constitution and by-laws for the better and democratic self-government of the church, consistent with established Baptist practice.
If, after these steps have successively been accomplished and reported to the court, there are members who do not find themselves in agreement with the expressed will of the majority, the fair thing for them to do is to transfer to a Baptist church more to their liking. Both they and Galilee stand to benefit by so simple and obvious a step.
There will be judgment in accordance with the views herein expressed.